142 N.J. Super. 581 (1976)
362 A.2d 581
LESTER S. STEWART, JR. AND ERNEST W. BOWKER, PLAINTIFFS-APPELLANTS,
v.
VINCENT E. SBARRO, CANIO SBARRO, VINCENT SBARRO, JR., AND THERESA SBARRO, DEFENDANTS, AND PETER J. BONANNI, ESQ., AND ROBERT B. DIETZ, ESQ., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 17, 1976.
Decided June 22, 1976.
*584 Before Judges FRITZ, SEIDMAN and MILMED.
Mr. Charles W. Heuisler argued the cause for appellants (Messrs. Archer, Greiner & Read, attorneys; Mr. Edward C. Laird, on the brief).
Mr. Robert Alan Vort argued the cause for respondent Peter J. Bonnani (Messrs. Weston, Kravitz & Rank, attorneys).
Mr. Neil F. Deighan, Jr., argued the cause for respondent Robert E. Dietz (Messrs. Kisselman, Deighan, Montano & Summers, attorneys).
PER CURIAM.
Plaintiffs challenge on this appeal so much of the judgment below which was "entered in favor of the defendants Robert E. Dietz, Esq., and Peter J. Bonnani, Esq.," and against them. They contend that the trial judge erred in determining that these defendants, each an attorney-at-law of this State, had not breached any duty owed by them to plaintiffs in connection with a certain transaction, the details of which appear below.
Stewart-Bowker Corporation owned certain lands and premises situated on Route 38, partly in the Township of Mount Holly and partly in the Township of Lumberton, Burlington County. Plaintiffs were its original incorporators and principal stockholders. The corporation operated a restaurant and tavern on the premises until 1966, when mounting debts forced the closing of the business and the placing of the liquor license in escrow with the municipal authorities.
In June 1969 plaintiffs entered into an agreement to sell all the shares of the corporate stock to Vincent E. Sbarro and Canio Sbarro. Plaintiffs were represented by Dietz, who prepared the contract, and the Sbarros by Bonnani. The consideration for the sale was the sum of $90,000, of which $5,000 represented brokers' commission. The purchasers *585 agreed to assume the corporate debts as listed on an appended schedule, up to $85,000, and to take over an existing mortgage held by the Burlington Trust Company.
Although the purchasers also agreed to relieve the sellers "individually of any obligations under the Twenty-two Thousand Six Hundred ($22,600.00) note to the First National Bank of Beverly," the bank refused to release plaintiffs from their personal liability on the corporate obligation, whereupon an addendum was prepared whereby the purchasers agreed to execute a second mortgage on the premises as security for their agreement to pay the note, and Vincent Sbarro, Sr. (the father of Vincent E. Sbarro) and his wife Theresa would also give to plaintiffs as additional security for the payment of the note a mortgage on their residence in Hamilton Township. The two obligations were contained in a single bond and mortgage.
The closing took place at Dietz's office on July 10, 1969. Both attorneys were present, as were all the Sbarros except Canio and Theresa. The stock certificates were endorsed by plaintiffs and turned over to Dietz. The bond and mortgage, which Dietz had prepared, could not be fully executed because of the absence of Canio and Theresa. There was also a question of the reinstatement of the forfeited corporate charter, and it appears that $400 was set aside to defray the payment of back taxes. Although there is disagreement among the parties on what authority was extended to the attorneys or what they undertook to do, there is no dispute that the corporate stock was turned over to the purchasers by Dietz and that Bonnani took with him the bond and mortgage in order to obtain the missing signatures.
The purchasers immediately took possession of the premises and opened for business on January 1, 1970. Quarterly interest payments on the note were made until September of that year. The bond and mortgage were never completed and delivered to Dietz. On August 15, 1970 Bonanni prepared a second mortgage in the amount of $25,000 from the corporation to Canio Sbarro and his wife, which was executed by *586 Canio as president and Vincent E. Sbarro as secretary of the corporation. In March 1972, Vincent Sbarro, Sr., who was then separated from his wife, conveyed to her his interest in the Hamilton Township property and she later sold it to a third person.
In October 1971 the corporation filed a bankruptcy petition, and a year later the corporate assets were sold for $187,000 plus dollar-for-dollar for the existing inventory, an amount sufficient to pay all secured creditors and to provide a 30% distribution to the unsecured creditors, including plaintiffs. The latter received $6,372.07, which was immediately turned over to the First National Bank of Beverly, reducing the principal balance on the note to $15,627.93. Subsequently, in this litigation, an order was entered directing Canio Sbarro, who had received $7,286.48 as a secured creditor in the bankruptcy proceedings, to deposit that amount in court or to post a bond as security. The money, it appears, was later released to plaintiffs and also applied to the balance on the note.
This lawsuit was instituted against all of the Sbarros referred to above and the two attorneys. The complaint alleged, among other things, that the mortgage in question was never fully executed; that Canio Sbarro and his wife took their now second mortgage from the corporation, thereby relegating plaintiffs to the position of general creditors of the corporation while still remaining liable on the note, and that Vincent Sbarro and his wife failed and refused to execute and deliver to plaintiffs, as agreed, the second mortgage on their premises. Judgment was sought ordering the Sbarros (1) to honor their agreement to indemnify plaintiffs against liability on the note; (2) to reimburse plaintiffs for all sums paid by them on said note; (3) to deliver the second mortgage, and (4) as to Canio Sbarro, to pay over all sums received by him as a creditor in the bankruptcy proceedings.
The complaint further averred that Bonanni, attorney for the purchasers, by failing to secure all the signatures on the *587 bond and mortgage and by preparing and securing the execution of a second mortgage from the corporation to Canio and Theresa Sbarro, breached his agreement "to secure full execution of the documents" and caused plaintiffs to be relegated to the position of unsecured creditors in the bankruptcy proceedings. Judgment was demanded in a sum sufficient to indemnify plaintiffs "for any and all liability including reasonable attorney's fees and costs incurred or to be incurred * * * by virtue of their guarantee of a note [to the First National Bank of Beverly] in the amount of $22,600.00."
Dietz was charged with negligence in releasing the shares of stock before the required signatures were obtained on the documents in question, and, further, in failing "to follow up on the transaction and insist upon the execution and delivery of the note and mortgages to him for the purpose of recording." Plaintiffs reiterated their assertion that they were thereby relegated to the position of unsecured creditors and did not have the security from Vincent Sbarro, Sr., and his wife, while remaining liable on the note held by the bank. The relief sought was the same as in the count against the other attorney.
At the conclusion of the trial, judgment was entered against the Sbarros directing them to pay (1) the outstanding balance on the note to the bank within 90 days, (2) $6,618.13, representing reimbursement to plaintiffs of interest on the note, (3) costs in the amount of $770.35. The judgment further provided that in the event the Sbarros failed to pay the balance on the note, plaintiffs could apply to the court on notice for the entry of a money judgment. It also directed the release of the sum of $7286.48, to which reference was made above. It does not appear that the Sbarros have appealed these portions of the judgment.
The trial judge issued a written opinion in which, as to the attorneys, he first addressed himself to the claim against Dietz, which, he said, "is based on the attorney's failure to withhold the endorsed stock certificates at the settlement *588 conference when he saw that defendants' mortgages were lacking essential signatures." This is only partially correct, for there was the additional charge in the complaint that Dietz "further failed to follow up on the transaction and insist upon the execution and delivery of the note and mortgages to him for the purpose of recording." In any event, we find no fault with the trial judge's findings that plaintiffs, though aware of the missing signatures, neither instructed their attorney to retain the stock certificates "nor were reluctant to complete the settlement and transfer without them"; and that "all parties having been made fully aware of the missing signatures and the void charter, it was their common desire to take the steps mentioned to remedy the situation and complete the settlement." These findings could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole. State v. Johnson, 42 N.J. 146, 162 (1964). We agree with the trial judge's conclusion that plaintiffs had failed to prove that Dietz "breached an express or implied duty to retain the stock certificates."
The trial judge spoke next of plaintiffs' undertaking at the settlement to cause steps to be taken to prepare and file the corporate franchise tax returns and reinstate the charter. He said:
While there is nothing to suggest that plaintiffs' failure to do so legally excused buyers from delivery of the security, there is ample evidence that, as a matter of fact, this failure of plaintiffs was the real or professed reason for buyers' failure to provide the second mortgage. If, then, plaintiffs' loss of the security promised would have happened as it did, whether or not Dietz retained the stocks or more vigilantly pursued and demanded the bond and mortgage, the asserted negligence of Dietz, even if otherwise established, would not be actionable. The pleadings effectively limit plaintiffs' grounds for recovery from Dietz to his failure to retain stock certificates and to exhort Bonanni to obtain signatures. Dietz was not the corporation attorney nor retained or otherwise committed to the responsibilities of a continuing lawyer-client relationship with plaintiffs or the Stewart-Bowker Corporation. He simply was hired to prepare for and attend the settlement. He was not retained, requested or paid to do any more than he did. Plaintiffs have failed to sustain *589 their burden of proving by a preponderance of the evidence that defendant, Dietz, breached his duty to plaintiffs. This conclusion makes it unnecessary for the Court to discuss the problems of proximate cause and damages.
We do not agree with the trial judge's reasoning in these respects or with his conclusion that there was not a breach of duty on the part of Dietz. It is to be noted, first, that the contract of sale was in no way conditioned upon the reinstatement of the corporate charter. The trial judge recognized that the purchasers were bound to deliver to plaintiffs the agreed security irrespective of the status of the charter. While Vincent Sbarro, Sr., testified that Bonanni told him and the others at the settlement he would hold up the execution of the mortgage until the corporate charter was provided, actually, according to Bonanni, "my client was very much in a hurry to get the settlement over because he already had jumped the gun and started making some repairs on the building or cleaning it up." It is also a fact that all necessary steps had been taken by then to effect the appropriate transfer of the liquor license. Moreover, the security documents were in fact signed by the Sbarros who were at the settlement, and could not be fully executed only because of the absence of Canio Sbarro and the wife of Vincent Sbarro, Sr. Actually, it turned out that Mrs. Sbarro, Sr., refused to sign the bond and mortgage and thus encumber the Hamilton Township property because, as Bonanni testified, "she was having domestic difficulties with her husband." Although Vincent E. Sbarro, when pressed by Bonanni for the remaining signatures, responded that "[t]hey didn't cooperate with me, let them sweat," it seems that, apart from the problem with Theresa Sbarro, Canio Sbarro was ill and "the family was concerned about him and didn't want to disturb him." The credible evidence in the record simply does not support the assertion that the missing signatures were not obtained because of the delay in reinstating the corporate charter. On the contrary, it is not disputed that the Sbarros took over the property and operated the *590 restaurant business until financial reverses caused them to close. Furthermore, when the corporate charter was finally reinstated in July 1971, months before bankruptcy proceedings, no effort was made even then to comply with the agreement regarding the security. The trial judge stated it well when he said that "the voided charter did not constitute an impediment to defendants' continuous and marginally profitable operation of business or their enjoyment of the benefits of the bargain."
The scope of an attorney's obligation to his client is "the duty of exercising the knowledge and skill ordinarily possessed and exercised by others in the profession." McCullough v. Sullivan, 102 N.J.L. 381, 385 (E. & A. 1925). While he is not an insurer, nor is he answerable for every error in judgment or mistake, he contracts, nevertheless, to
* * * use the reasonable knowledge and skill in the transaction of business which lawyers of ordinary ability and skill possess and exercise. On the one hand he is not to be held accountable for the consequences of every act which may be held to be an error by a court. On the other hand, he is not immune from the responsibility, if he fails to employ in the work he undertakes that reasonable knowledge and skill exercised by lawyers of ordinary ability and skill. The duties and liabilities between an attorney and his client are the same as those between a physician and his patient. Both the attorney and physician are required to exercise that reasonable knowledge and skill ordinarily possessed and exercised by others in their respective professions. [at 384]
It is not open to debate that Dietz's undertaking to his clients required him to see to it that the sale was consummated in accordance with the terms of the agreement. He was not engaged merely to "prepare for and attend the settlement." A key element of the consideration was the assumption by the purchasers of the note held by the First National Bank of Beverly, the only corporate debt on which the sellers were exposed to personal liability. Since the bank had refused to release plaintiffs from their obligation, it was important to them that the purchasers' agreement to pay the note in accordance with its terms should be secured in *591 some fashion. That was the underlying purpose of the bond and mortgage for which provision was made in the addendum to the agreement.
There can be no doubt whatever that Dietz was under a duty to obtain for his clients a properly executed bond and mortgage and to cause the same to be duly recorded. His obligation did not end when he turned the documents over to Bonnani upon the latter's agreement to obtain the two missing signatures. Adequate representation of his clients required him to pursue the matter assiduously in order fully to protect their interests. Cf. In re Lanza, 65 N.J. 347, 351 (1974).
According to Dietz' own testimony, all he did was to "call Mr. Bonnani on occasion" and "ask and beg him to send back the papers which I was waiting for." He said that the answer he received was, "[w]ell, you people, your people haven't taken care of straightening out the corporation." But, aside from two or three telephone calls he said he made in 1969, and several others thereafter, he did nothing further until on December 17, 1971, after the bankruptcy petition had been filed, he wrote to Bonnani demanding the return of the documents and adding, prophetically, "I do not wish to be held libel [sic]."
Since, as seems clear, the furnishing of the security was not contingent upon the reinstatement of the corporate charter, Dietz' failure to advise his clients of the risk inherent in the failure of the Sbarros to complete the execution of the bond and mortgage, and thereafter to take timely and appropriate steps to compel the enforcement of the agreement, was unquestionably a breach of the duty he owed to his clients. As the trial judge said, "From beginning to end, the Sbarros have engaged in obstructionary and evasionary tactics. They have shown a lack of candor and an unwillingness to perform legal obligations that the court finds profoundly disturbing." Their conduct would have quickly become apparent to Dietz had he proceeded diligently. In our view, Dietz' conduct violated the requisite standard of reasonable *592 care. On the facts here present, we do not think that expert testimony was required to support plaintiffs' cause of action. Cf. Central Cab Co. v. Clarke, 259 Md. 542, 270 A.2d 662 (Ct. App. 1970). We find, in the exercise of our original jurisdiction (R. 2:10-5), that Dietz was negligent. The judgment in his favor is reversed, and the cause will be remanded for trial limited to the issues of proximate cause and damages, matters which the trial judge deemed unnecessary to discuss and decide in view of his disposition of the negligence issue.
We note that Dietz' answer contained a crossclaim for indemnification against defendants Sbarro, which was dismissed below presumably because of the judgment in his favor. The dismissal of the crossclaim should, of course, be vacated.
We turn now to the admittedly more difficult question of the liability of Bonnani. As to him, the trial judge said:
While defendant Bonanni's conduct in executing the second mortgage to Canio Sbarro when it should have gone to plaintiffs is not above reproach, the evidence fails to support the claim that he breached a duty owed to plaintiffs. Bonanni, it appears, did make bona fide albeit unsuccessful efforts to have the settlement instruments completed. His statement at settlement that he was willing to obtain the signatures manifested a desire to work an accommodation between the parties and was not a tortious misrepresentation of fact or promise. Plaintiffs have failed to prove they are entitled to relief against defendant, Bonanni.
Our examination of the record leads us to conclude that the trial judge viewed too narrowly Bonnani's role in the events which followed the closing at Dietz' office. While it is evident that he was unsuccessful in obtaining the required signatures, despite what he contends were bona fide efforts on his part, the issue, as we see it, is not whether he tortiously misrepresented any "fact or promise," to use the words of the trial judge. The complaint does not charge him with such misconduct, and the proofs do not establish it. Rather, our concern here is whether Bonanni owed any duty to plaintiffs *593 and, if so, whether he was guilty of a breach thereof. Our attention is focused particularly on Bonnani's part in the execution and delivery of a second mortgage from the corporation to Canio Sbarro and his wife on August 15, 1970, knowing that this would effectively prevent the corporation from fulfilling its obligation to plaintiffs under the agreement. The trial judge mildly characterized Bonnani's conduct as "not above reproach." We think it was an inexcusable disregard of a responsibility he had previously accepted, and we reject his argument that he had a legal duty which ran only to the buyers.
It is true that generally an attorney is not liable to third persons for negligence in the performance of his professional duties. See Annotation, "Attorney's liability, to one other than his immediate client, for consequences of negligence in carrying out legal duties," 45 A.L.R.3d 1181 (1972). But this rule is not all encompassing. Thus, where an attorney assumes a fiduciary obligation, it applies to persons who, though not strictly clients, he has or should have reason to believe rely on him. In re Genser, 15 N.J. 600, 606 (1954); Drinker, Legal Ethics (1953), at 92. We believe, moreover, that where, as here, an attorney undertakes a duty to one other than his client, he may be liable for damage caused by a breach of that duty to a person intended to be benefited by his performance. Cf. Donald v. Garry, 19 Cal. App.3d 769, 97 Cal. Rptr. 191, 192 (D. Ct. App. 1971):
The determination of whether the duty undertaken by an attorney extends to a third person not in privity "involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (Biakanja v. Irving, 49 Cal.2d 647, 650, 320 P.2d 16, 65 A.L.R. 2nd 1358; see also Lucas v. Hamm, 56 Cal.2d 583, 15 Cal. Rptr. 821, 364 P.2d 685.)
*594 We do not hold that Bonanni was at fault in failing to obtain the needed signatures. His dereliction was in not advising plaintiffs' attorney within a reasonable time that all efforts have been unproductive and offering to return the documents, and, more importantly, in participating in the preparation and execution of the corporate second mortgage to Canio Sbarro and wife, despite the fact that he was still in possession of the documents to which plaintiffs were entitled. A clearer breach of duty on his part cannot be envisaged. Consequently, we also reverse the judgment in his favor and, as in the case of Dietz, the cause will be remanded for trial limited to the issues of proximate cause and damages.
The judgment in favor of defendants Robert E. Dietz and Peter J. Bonanni and against plaintiffs is reversed. The dismissal of defendant Dietz' crossclaim for contribution is vacated. The matter is remanded for further proceedings consistent with the foregoing. We do not retain jurisdiction.