Eleanor W. O'NEIL, Appellant,

v.

Raymond BERGAN, et al., Appellees.

No. 81–1034.

District of Columbia Court of Appeals.

Argued June 29, 1982.

Decided Oct. 21, 1982.

---

William J. Chen, Jr., Washington, D.C., for appellant.

David N. Webster, Washington, D.C., with whom Ronald G. Precup and Lucien

Hilmer, Washington, D.C., were on the brief, for appellees.

Before KELLY, MACK, and FERREN, Associate Judges.

FERREN, Associate Judge:

This case presents two principal questions: whether the trial court erred (1) in directing a verdict in favor of appellees, partners in the law firm of Williams & Connolly,[1] on the ground that appellant had failed to make out a prima facie case of legal malpractice or breach of contract; or (2) in refusing appellant permission to call defense counsel as a witness, and in denying appellant's motion to disqualify defense counsel on ethical grounds. Finding no error, we affirm.

### I. FACTS AND PROCEEDINGS

In reviewing a directed verdict, we must consider the evidence in the light most favorable to appellant. *See Mills v. Cosmopolitan Insurance Agency, Inc.,* D.C.App., 424 A.2d 43, 46 (1980). From this viewpoint, the evidence at trial established the following facts:

Appellant, Eleanor O'Neil, is a minority shareholder in the A.P. Woodson Company (Woodson), a home heating oil corporation owned almost entirely by her family. In December 1973, Woodson offered to redeem O'Neil's and her children's shares for $656,-719.50. This price was the "fair market value" of the stock as determined under a 1972 stockholders' agreement providing that "fair market value" would be calculated based on the appraised value of company property and on a "good-will factor." Woodson was willing to pay the full purchase price in cash, or to give O'Neil cash plus a real estate parcel known as "Ward Court." O'Neil refused this offer.

O'Neil decided she needed an attorney to represent her in further dealings with Woodson. In June 1975, after hiring and dismissing two attorneys, she approached the firm of Williams & Connolly. The firm assigned John Mendenhall, a tax specialist, to represent O'Neil. Mendenhall accepted her retainer and introduced her to Paul Wolf, who would assist him.[2] O'Neil informed Mendenhall that she wished to investigate suspected wrongdoing by Woodson's management and to have Woodson redeem her stock and her children's stock for its "actual value," in exchange for cash and the Ward Court property.

Over the next fifteen months, Mendenhall met with O'Neil (and with members of her family who acted as her advisors) at least six times, and communicated with her by mail and by telephone. Mendenhall procured from Woodson and turned over to O'Neil information about (1) the company's tax returns, (2) corporate income paid out as dividends, (3) the sale of certain real estate by the company, (4) the hiring and firing of company employees, and (5) corporate expenditures for executive compensation, employee bonuses, entertainment and travel allowances, insurance premiums, club fees, and loans. O'Neil testified that Williams & Connolly assembled "thousands" of documents for her.

In December 1975 and January 1976, Mendenhall took action to forestall Woodson's sale of the Ward Court real estate. When Woodson's attorney notified Mendenhall that the company contemplated selling the property, Mendenhall consulted O'Neil and, at her instruction, wrote to Woodson threatening court action if the sale went through. Woodson did not sell the property.

In August 1976, O'Neil's mother informed her that Mendenhall was planning to leave Williams & Connolly. O'Neil telephoned Mendenhall, and he confirmed that he expected to leave the firm in October 1976. O'Neil asked him to represent her at Woodson's annual stockholders' meeting before he left, and he agreed. Mendenhall attend-

---

1. O'Neil originally named the partnership of Williams & Connolly as a defendant but amended her complaint to name each partner individually.

2. Thereafter, the firm billed O'Neil on an hourly basis; she paid Williams & Connolly a total of $8,406.00 in fees.

ed the meeting in September 1976 and distributed a letter written by O'Neil which alleged that Woodson's attorney had insulted her.

Just before leaving the firm, Mendenhall met with O'Neil. He introduced her to his partner, Raymond Bergan, a negotiation specialist, and told her that Bergan would handle her affairs for Williams & Connolly. Mendenhall pointed out that he would be traveling frequently to Washington, D.C., from his new home in New York and would be available to assist Bergan during the transition period.

In November 1976, O'Neil telephoned Bergan and requested him to inform Woodson that he had replaced Mendenhall as her counsel. Bergan asked O'Neil to notify the company herself, and she did so. In December 1976, Bergan obtained information for O'Neil about the termination of a Woodson employee, Jack Cooper, and forwarded it to her by mail. Between January and June 1977, O'Neil met with Bergan several times.[3] Bergan obtained answers from Woodson to eighteen additional questions posed by O'Neil about the Cooper termination, as well as information about the termination of another Woodson employee, Gerald Furst.

In June 1977, Bergan telephoned O'Neil and set up a meeting to discuss terms for redemption of her stock and her children's stock. O'Neil told Bergan that as compensation for these shares she wished to receive a cash payment, as well as the Ward Court property, and an assurance that her ex-husband would continue as a vice president of Woodson. O'Neil and Bergan agreed that the price of her stock and her children's stock should total $1.25 million.

About one month after the meeting, in July 1977, Bergan sent O'Neil a draft letter to Woodson proposing an asking price for the stock of $1.5 million. O'Neil telephoned Bergan's office and instructed his secretary

not to send Woodson the draft letter. She then discharged Williams & Connolly as her attorneys.

At the close of appellant's evidence—consisting of evidence by O'Neil, her ex-husband, her son, and her former brother-in-law[4]—appellees moved for a directed verdict on the ground that the jury could not properly deal with either the contract or the malpractice claim because appellant had not offered the expert testimony necessary to establish the standard of care. Appellees also argued that the evidence in any event did not establish liability or damages. Counsel for appellant replied that the evidence was sufficient to show that, in fifteen months, appellees had devised "no game plan," had failed to obtain the value of the stock, had not followed O'Neil's instructions to propose a total price of $1.25 million for the stock, had not prepared a redemption agreement, and had abandoned O'Neil as a client—all resulting in "a prima facie case of no performance" and thus malpractice, as well as a breach of contract. Counsel for appellant conceded that the value of the Woodson stock had increased during the period of appellees' representation but argued that his client had been damaged because "she has lost the use of money" during that period.

The trial court granted appellees' motion for a directed verdict, stating,

The case went forward both on a theory of contract and on a theory of tort, mal legal, in malpractice. There has been no expert testimony making reference to standards of care. I have seen no proof here independently of any expert testimony which would support a charge in malpractice. I have seen no proof of damages. I have seen no proof of breach of contract.

The Court, at this stage of the proceedings, resolving inferences in the light most favorable to the Plaintiff, still feels

---

3. In early 1977, O'Neil also telephoned Paul Wolf, who had assisted Mendenhall, to ask Wolf if he could work on her case. He explained that he could not because the firm had assigned him to other matters.

4. O'Neil's former brother-in-law was a lawyer and certified public accountant with an accounting firm. O'Neil did not proffer him, nor did he testify, as an expert witness.

that there is not a case to go to the jury and it grants the motion.

The court entered judgment accordingly, and appellant timely noted this appeal.

## II. MALPRACTICE AND CONTRACT CLAIMS

Appellant contends the trial court erred in directing a verdict for appellees, since reasonable jurors could have determined, from evidence of record, that appellees failed to perform their contract in good faith "in a reasonably skillful manner," and also committed professional malpractice, because: (1) Mendenhall did not prepare a stock redemption agreement; (2) Mendenhall and Bergan did not make "reasonable efforts" to determine the "value" of O'Neil's and her children's stock; (3) Mendenhall did not provide "an appropriate transition" when he left the firm; and (4) Bergan asked O'Neil herself to notify Woodson that he was her attorney.

### A. Attorney Malpractice

█ The elements of an action for professional negligence are the same as those of an ordinary negligence action. "The plaintiff bears the burden of presenting evidence 'which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of.'" *Morrison v. MacNamara,* D.C.App., 407 A.2d 555, 560 (1979) (citations omitted). A uniform standard of care applies in actions for negligence: reasonable care under the circumstances. *Morgan v. District of Columbia,* D.C.App., 449 A.2d 1102, 1108–09 (1982). Inherent in such reasonable care, however, is the requirement "that those with special training and experience adhere to a standard of conduct commensurate with such attributes." *Morrison, supra* at 560. Thus, "a lawyer must exercise that degree of reasonable care and skill expected of lawyers acting under similar circumstances." *Id.* at 561.

The question then becomes: how is the plaintiff to establish for the trier of fact the expected degree of reasonable care and skill appropriate to the case? In the medical malpractice context, the rule in this jurisdiction is that a plaintiff must present expert testimony establishing the applicable standard of care unless common knowledge warrants an inference of negligence. *Baylor v. United States,* D.C.App., 407 A.2d 664, 669 (1979); *Harris v. Cafritz Memorial Hospital,* D.C.App., 364 A.2d 135, 137 (1976) (per curiam), *cert. denied,* 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977); *Haven v. Randolph,* 161 U.S.App.D.C. 150, 151, 494 F.2d 1069, 1070 (1974) (per curiam); *Smith v. Reitman,* 128 U.S.App.D.C. 352, 353, 389 F.2d 303, 304 (1967). We conclude that appellees are correct: the same rule should apply in attorney malpractice actions. *Hughes v. Malone,* 146 Ga.App. 341, 345, 247 S.E.2d 107, 111 (1978); *Hill v. Okay Construction Co.,* 312 Minn. 324, 336, 252 N.W.2d 107, 116 (1977); *Olfe v. Gordon,* 93 Wis.2d 173, 181, 286 N.W.2d 573, 577 (1980); *see Morrison, supra* at 560–61 (same standard of care applies to physicians, attorneys, optometrists, and insurance agents).

█ Specifically, we adopt the widely followed rule that, in a legal malpractice action, the plaintiff must present expert testimony establishing the standard of care unless the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge. *See, e.g., Lentino v. Fringe Employee Plans, Inc.,* 611 F.2d 474, 480–81 (3d Cir.1979) (applying Pennsylvania law); *Wilkinson v. Rives,* 116 Cal.App.3d 641, 648, 172 Cal.Rptr. 254, 256–57 (1981); *Gibson v. Talley,* 156 Ga.App. 593, 594, 275 S.E.2d 154, 156 (1980); *Sheetz v. Morgan,* 98 Ill.App.3d 794, 799, 54 Ill.Dec. 117, 120–21, 424 N.E.2d 867, 870–71 (1981); *Baker v. Beal,* 225 N.W.2d 106, 112 (Iowa 1975); *Glidden v. Terranova,* —— Mass.App. ——, ——, 427 N.E.2d 1169, 1170–71 (1981); *Hill, supra,* 312 Minn. at 336, 252 N.W.2d at 116; *Walters v. Hastings,* 84 N.M. 101, 107, 500 P.2d 186, 192 (1972); *Lenius v. King,* 294 N.W.2d 912, 914 (S.D.1980); *Walker v. Bangs,* 92 Wash.2d 854, 858, 601 P.2d 1279, 1282 (1979) (en banc); *Olfe, supra,* 93 Wis.2d at 181, 286 N.W.2d at 577. *See also* Annot., *Admissi-*

*bility and Necessity of Expert Evidence as to Standards of Practice and Negligence in Malpractice Action Against Attorney,* 14 A.L.R. 4th 170 (1982); Standardized Civil Jury Instructions for the District of Columbia, No. 9–5 (1981) ("You must determine the standard of professional learning, skill and care required of the defendant only from the opinions of the (doctors, lawyers, architects, etc.) who have testified as expert witnesses as to such standard").[5]

The kind of care and skill that can be found within the jury's common knowledge may include typical failures to act; for example, allowing the statute of limitations to run on the client's claim, *House v. Maddox,* 46 Ill.App.3d 68, 73, 4 Ill.Dec. 644, 648, 360 N.E.2d 580, 584 (1977); *George v. Caton,* 93 N.M. 370, 377, 600 P.2d 822, 829–30 (1979), or permitting entry of a default against the client, *Glidden, supra* —— Mass. App. at ——, 427 N.E.2d at 1170–71.[6] The present case, however, does not fall within the "common knowledge" exception to the · expert testimony requirement. While investigating suspected corporate misconduct and taking various actions to prepare for redemption of O'Neil's and her children's Woodson stock, appellees did not exhibit any lack of skill or care which jurors, as a matter of common knowledge, could have found negligent. The subject matter of the representation, when coupled with the substantial amount of legal work appellees concededly did undertake for appellant, makes the case too complex for jury analysis without expert help.

■ Accordingly, since appellant presented no expert testimony as to standard of care (as the trial court properly found), she failed to make out a prima facie case of attorney negligence, and the trial court properly directed a verdict as to her malpractice claim. *See Lipscomb v. Krause,* 87 Cal.App.3d 970, 975–76, 151 Cal.Rptr. 465, 468 (1978); *Wright v. Williams,* 47 Cal. App.3d 802, 810–11, 121 Cal.Rptr. 194, 199–200 (1975); *Hughes, supra* 146 Ga.App. at 345–49, 247 S.E.2d at 111–13; *Schmidt v. Hinshaw, Culbertson, Moelmann, Hoban & Fuller,* 75 Ill.App.3d 516, 522, 31 Ill.Dec. 357, 361–62, 394 N.E.2d 559, 563–64 (1979); *Baker, supra* at 112–13; *Sanders v. Smith,* 83 N.M. 706, 708–09, 496 P.2d 1102, 1104–05 (App.1972).

### B. Breach of Contract

Appellant did not base her breach of contract claim on an alleged promise to achieve a specific result. She based it, rather, on appellees' implied agreement to deal in good faith and to perform with reasonable skill. *See Kirsch v. Duryea,* 21 Cal.3d 303, 308, 578 P.2d 935, 938–39, 146 Cal.Rptr. 218, 221–22 (1978) (en banc); *Stewart v. Sbarro,* 142 N.J.Super. 581, 589, 362 A.2d 581, 586 (per curiam), *cert. denied,* 72 N.J. 459, 371 A.2d 63 (1976); *George, supra* 93 N.M. at

---

5. The rule should be applied whether a judge or a jury is the trier of fact. *Lentino v. Fringe Employee Plans, Inc.,* 611 F.2d 474, 481 (3d Cir.1979) (applying Pennsylvania law). *Contra Muse v. St. Paul Fire and Marine Ins. Co.,* 328 So.2d 698, 702 (La.App.1976) (expert testimony is not required in bench trial, since standard of care may be "recognized by the trial court, which is familiar with the standards of practice in its locality") (citing *Watkins v. Sheppard,* 278 So.2d 890 (La.App.1973)).

6. Expert testimony has been held unnecessary in cases involving other failures to act. *See Suritz v. Kelner,* 155 So.2d 831, 834 (Fla.Dist. Ct.App.1963) (per curiam), *cert. denied,* 165 So.2d 178 (Fla.1964) (failure to instruct client to answer interrogatories); *Collins v. Greenstein,* 61 Hawaii 26, 39, 595 P.2d 275, 282–83 (1979) (failure to allege affirmative defenses); *Sorenson v. Fio Rito,* 90 Ill.App.3d 368, 371, 45 Ill.Dec. 714, 720, 413 N.E.2d 47, 53 (1980) (fail-

ure to file state inheritance tax returns); *Olfe, supra* 93 Wis.2d at 182, 286 N.W.2d at 578 (failure to follow client's explicit instructions). *Cf. Hill, supra* 312 Minn. at 337–38, 252 N.W.2d at 116–17 (expert testimony unnecessary in case involving obvious conflict of interest).

Some courts, moreover, have stated that, in cases of obvious negligence, the court may rule, without benefit of expert testimony, that the attorney committed a breach of the duty of care as a matter of law. *See Baker, supra* at 112; *Central Cab Co. v. Clarke,* 259 Md. 542, 550, 270 A.2d 662, 667 (1970); *Joos v. Auto-Owners Ins. Co.,* 94 Mich.App. 419, 423, 288 N.W.2d 443, 445 (1979); *Stewart v. Sbarro,* 142 N.J.Super. 581, 591, 362 A.2d 581, 587 (per curiam), *cert. denied,* 72 N.J. 459, 371 A.2d 63 (1976); *Walters, supra* 84 N.M. at 107, 500 P.2d at 192.

376, 600 P.2d at 828. Appellant accordingly contends she presented sufficient evidence for a jury to conclude that appellees committed a breach of this implied agreement.

Whether a complaint is based on tort or breach of contract, however, "the liability of an attorney for failure to properly perform his duties is governed by the [same] general standard of care ...." *Lysick v. Walcom,* 258 Cal.App.2d 136, 147, 65 Cal.Rptr. 406, 414 (1968); *see Kirsch, supra* 21 Cal.3d at 308, 578 P.2d at 938–39, 146 Cal.Rptr. at 222 ("These principles [governing attorney liability] are equally applicable whether the plaintiff's claim is based on tort or breach of contract") (citing *Lucas v. Hamm,* 56 Cal.2d 583, 591, 364 P.2d 685, 689, 15 Cal.Rptr. 821, 825 (1961)) (en banc), *cert. denied,* 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962). In short, the "reasonable skill" promised in the implied agreement is the same as the "reasonable skill" which an attorney must display to avoid tort liability.

Appellant failed to make out a prima facie contract claim for the same reason she failed to make out a prima facie case of negligence: she did not offer the expert testimony needed to define "reasonable skill," the element common to the tort and contract claims. *See* Part II.A. *supra; Kirsch, supra* 21 Cal.3d at 308, 578 P.2d at 938–39, 146 Cal.Rptr. at 222; *Lysick, supra* 258 Cal.App.2d at 147, 65 Cal.Rptr. at 414; *Lucas, supra* 56 Cal.2d at 591, 364 P.2d at 689, 15 Cal.Rptr. at 825. Accordingly, the trial court did not err in directing a verdict as to both of appellant's claims.[7]

---

7. Appellant also argues, for the first time on appeal, that appellees waived their right to move for a directed verdict at the close of appellant's evidence, and that the trial court accordingly erred in granting the motion. More specifically, citing *Henderson v. Allison,* D.C.Mun.App., 44 A.2d 220, 221 (1945) and *De Bobula v. Coppedge,* D.C.Mun.App., 40 A.2d 255, 256 (1944), *aff'd,* 90 U.S.App.D.C. 28, 193 F.2d 35 (1951), appellant asserts that appellees made this waiver by putting on a defense witness out of turn, during appellant's case in chief (with the court's permission when the witness had to leave town, and without objection by appellant). We reject this argument.

## III. ETHICAL CLAIMS

Appellant asserts that the trial court erred in prohibiting her from calling defense counsel, David Webster, as a witness, and in denying her motion to disqualify Webster on ethical grounds.

### A. Refusal to Permit Appellant to Call Defense Counsel as a Witness

Defense counsel, David Webster, was a partner in Williams & Connolly at the time the suit was filed (he left the firm a few weeks before trial). Thus, he is a party defendant. Appellant's counsel sought permission to call Webster as a witness, saying:

> He has been named as a partner, named 25 defendants in this case, and I want to find out why the contract was not done, why the matter was not discussed, whether, in fact, it was discussed at partnership meetings, why nobody showed any concern about her individual problems and why the contract wasn't completed.

The trial court refused appellant's request. The court noted that Webster had stated in sworn answers to interrogatories that he had no personal knowledge of appellant's dealings with other members of the firm, and that appellant had testified she did not remember ever meeting Webster before trial.

Assuming for the sake of argument that appellant's request to call Webster constituted a proffer sufficient to preserve the issue for appeal, we conclude that the trial court did not err in disallowing Webster's testimony. In general, "[a] wit-

---

*Henderson* and *De Bobula* held that, by putting on his or her own case, a defendant waives the right to appeal an adverse judgment on the ground that the court should have granted a directed verdict based on the plaintiff's evidence alone. These cases do not suggest, however, that a defendant waives the right to move for a directed verdict at the close of the plaintiff's case merely by putting on evidence out of turn. *See Niosi v. Aiello,* D.C.Mun.App., 69 A.2d 57, 59 (1949) ("A defendant does not lose his right to make a motion for a directed verdict in his favor even though he has himself offered evidence ....") (footnote omitted).

ness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." Fed.R.Evid. 602; *see Chapman v. Capital Traction Co.,* 37 App.D.C. 479, 485 (1911); 10 J. MOORE & H. BENDIX, MOORE'S FEDERAL PRACTICE § 602.02 (2d ed. 1982). Trial counsel may not be called as a witness by the opposing party, and thus made subject to disqualification, unless the opposing party shows a genuine need for the evidence. *See Ross v. Great Atlantic & Pacific Tea Co.,* 447 F.Supp. 406, 408–10 (S.D.N.Y.1978); *Connell v. Clairol, Inc.,* 440 F.Supp. 17, 18 n. 1 (N.D.Ga.1977); *Cottonwood Estates, Inc. v. Paradise Builders, Inc.,* 128 Ariz. 99, 105, 624 P.2d 296, 302 (1981) (en banc).

■ Because appellant failed to lay a foundation establishing that Webster's testimony was necessary—and because Webster's answers to interrogatories, as well as appellant's own testimony, indicated that Webster had no personal knowledge of any relevant matter—the trial court properly refused to allow appellant to call Webster as a witness.

B. *Denial of Motion to Disqualify Counsel*

■ Appellant filed a pretrial Motion for Separate Counsel and a Motion for Reconsideration of the Motion for Separate Counsel, asking the court to disqualify Webster, on ethical grounds, from representing the other appellees. The court denied both motions.

Appellant argues that the court erred in denying her motions because Webster's representation of appellees violated the ABA Code of Professional Responsibility, as amended by this court. D.C.App. R. X. Specifically, appellant contends Webster violated: DR 5–101(A), which provides that, except with the client's consent, a lawyer shall not accept employment if the lawyer's judgment may be affected by his or her personal or financial interest;[8] DR 5–101(B), which provides that under some circumstances a lawyer may not act as both witness and advocate;[9] and Canon 9, which cautions a lawyer to avoid even the appearance of professional impropriety. The determination whether trial counsel must be disqualified is within the sound discretion of the trial court. *See Lefrak v. Arabian American Oil Co.,* 527 F.2d 1136, 1140 (2d Cir.1975), *quoting Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975). We perceive no abuse of discretion here.

■ Even if we assume that a lawyer in Webster's firm "ought to [have been] called as a witness,"[10] DR 5–101(B), that provision does not apply in this context. Webster had not accepted "employment," within the meaning of DR 5–101(B), since the firm, in effect, was representing itself. DR 5–101(B) does not bar an attorney from appearing pro se and testifying in his or her own case. *See Grasso v. General Motors Corp.,* 101 Misc.2d 140, 142, 420 N.Y.S.2d 625, 626–27 (N.Y.Sup.Ct.1979); *Brown v. Toledo Mental Hygiene Clinic,* 63 Ohio

8. DR 5–101(A) provides:
    Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

9. DR 5–101(B) provides:
    A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:
    (1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
    (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
    (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

10. As explained in Part III.A., however, Webster was not a qualified witness. Mendenhall, who did testify, had left Williams & Connolly in 1977.

App.2d 192, 194, 410 N.E.2d 1262, 1264 (1978).[11] Nor does DR 5–101(B) bar an attorney-witness who is entitled to self-representation from retaining another member of his or her firm as counsel. *See* Opinion No. 44 of the Legal Ethics Committee of the District of Columbia Bar (such an arrangement is "properly viewed as analogous to *pro se* representation"); *Harrison v. Keystone Coca-Cola Bottling Co.,* 428 F.Supp. 149, 152–53 (M.D.Pa.1977) (attorney who is party litigant and will testify is not barred from retaining his own firm as counsel); *Borman v. Borman,* 378 Mass. 775, 788, 393 N.E.2d 847, 856 (1979) (same); *see also International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1293–95 (2d Cir.1975) (former partner in law firm who is party defendant in lawsuit arising out of activities with firm is not barred from retaining former firm on ground he will be witness at trial). *But see Bottaro v. Hatton Associates,* 528 F.Supp. 1116 (E.D.N.Y.1981); *In re Cunningham,* 75 A.D.2d 521, 426 N.Y.S.2d 765 (1980) (per curiam) (dictum); *Town of New Castle v. Forum Associates Ltd.,* 60 A.D.2d 576, 400 N.Y.S.2d 9 (1977) (per curiam).[12]

Similarly, Webster did not "accept employment" within the meaning of DR 5–101(A), and, in any event, his interest in the outcome of the case was fully known to the other appellees and was not in conflict with their interests. Finally, we perceive no "appearance of impropriety" under Canon 9. Accordingly, we conclude that the trial court did not abuse its discretion in denying appellant's motion to disqualify Webster.

In sum, the trial court acted properly in directing a verdict as to appellant's tort and contract claims, and in denying appellant's requests to call Webster as a witness and to disqualify him from representing the other appellees.

*Affirmed.*

---

11. *But cf. Gasoline Expwy., Inc. v. Sun Oil Co.,* 64 A.D.2d 647, 648, 407 N.Y.S.2d 64, 65 (1978) (per curiam), *aff'd,* 47 N.Y.2d 847, 392 N.E.2d 572, 418 N.Y.S.2d 585 (1979) (attorney who is sole shareholder in corporation, by doing business in corporate form, has waived right to represent her corporation "pro se").

12. Testimony by Webster or by Williams & Connolly attorneys would not fall within DR 5–101(B)(3), which permits attorney testimony relating "solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client," for appellant's suit against appellees does not concern the legal services which the testifying attorney has rendered on behalf of the client for whom the attorney is testifying. *Cf. Ahlers v. C & S Equip. Inc.,* 405 So.2d 464 (Fla.Dist.Ct.App. 1981) (per curiam) (in suit on contract providing for payment of attorneys' fees in event of breach, plaintiff's attorney could testify as to the nature and value of his services). *But see Spilky v. Hirsch,* 102 Misc.2d 536, 538, 425 N.Y.S.2d 934, 935–36 (1980) (per curiam) (attorney-plaintiffs in suit to recover legal fees from client were entitled to represent themselves, even if required to testify, because testimony would relate to legal fees).