Lawrence J. BERNARD, Jr., Plaintiff–Appellee,

v.

LAS AMERICAS COMMUNICATIONS, INC., Defendant–Appellant.

No. 282, Docket 95–7305.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1995.

Decided May 16, 1996.

---

Eduardo F. Lopez, New York City (Lopez & Romero, New York City, of counsel), for Plaintiff–Appellee.

Russell Munves, New York City (Steven G. Storch, Storch, Amini & Munves, P.C., New York City, of counsel), for Defendant–Appellant.

Before LUMBARD, CARDAMONE, and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Defendant-appellant Las Americas Communications, Inc. ("LAC") appeals from a judgment entered March 9, 1995 after a jury trial in the United States District Court for the Southern District of New York, Sonia Sotomayor, *Judge,* that awarded plaintiff-appellee Lawrence J. Bernard, Jr. a contingent portion of a legal fee related to his representation of LAC in its application for a radio station license from the Federal Communications Commission (the "FCC"). The judgment also dismissed with prejudice LAC's counterclaim for legal malpractice. LAC argues on appeal that the district court erred in charging the jury on proximate causation, damages, and materiality, and in excluding evidence regarding the value of the license that LAC sought.

We affirm in part and vacate and remand in part.

## Background

In 1982, LAC, a New Jersey corporation having its principal place of business in New York decided to apply to the FCC for a

license to build and operate an FM radio station in Newark, New Jersey (the "License"). LAC retained the services of attorney Bruce Eisen to represent it with respect to this application.

In order to finance the project, LAC developed a relationship with the New York National Bank ("NYNB"). On October 28, 1985, NYNB agreed to extend a $400,000 line of credit to LAC if the FCC granted LAC the License. NYNB also loaned $75,000 to LAC on November 29, 1985, to be repaid by February 24, 1986. In consideration of their providing certain collateral to secure the loan, LAC executed a "promise to sell a 12% equity interest in [LAC] to Mr. Frank Flores and Mr. Antonio Acevedo[,] 6% each." During the early months of 1986, NYNB periodically agreed to extend this loan.

In June 1986, however, NYNB informed LAC that it was no longer willing to fund LAC's ongoing expenses, and on June 24, 1986, it demanded immediate repayment of the outstanding loan. LAC needed NYNB's line-of-credit commitment, the funds from the outstanding loan, and an additional $60,000 in order successfully to continue the FCC loan application process. Immediately thereafter, LAC's president, L. Raul Bernard ("President Bernard"), telephoned plaintiff-appellee Lawrence J. Bernard, Jr. ("Bernard"), an attorney in Washington, D.C., regarding the FCC application and its funding.[1] They agreed to meet a few days later at Bernard's Washington office.

At the meeting, President Bernard and Bernard telephoned Serafin Mariel, the president of NYNB, and arranged a meeting with Mariel later that day. During this meeting, Bernard learned of the outstanding loan to LAC and NYNB's demand for its repayment. In the course of this meeting with Mariel, the parties arrived at the outlines of an agreement (the "Loan Agreement") for NYNB's continued support of LAC's FCC application. Specifically, it was agreed that: (1) Bernard would represent LAC throughout the application process; (2) Flores and Acevedo would provide $150,000 to LAC to satisfy LAC's

obligations to NYNB and to Eisen, LAC's former counsel, and to pay for ongoing legal services related to the License application; and (3) if LAC's application was granted by the FCC, LAC would pay Flores and Acevedo an amount equivalent to twelve percent of the value of the radio station.

Shortly thereafter, Bernard and LAC executed a retainer agreement dated July 8, 1986 under which Bernard was to receive an initial fee of $20,000 as compensation for his services. As presently relevant, the agreement also provided that

> 4.... [I]n the event Las Americas decides to dismiss its application, either in the Court or at the FCC, in return for a payment from another applicant, Las Americas will pay [Bernard] a fee ... equal to eight percent (8%) of all amounts received in excess of Two Hundred Thousand Dollars ($200,000.00), payable at such time as Las Americas actually receives funds in excess of $200,000.00.
>
> ....
>
> It is understood and agreed that Las Americas may terminate [Bernard's] services at any time and proceed with the prosecution of its application with another attorney, provided that paragraph[ ] 4 ... above will remain in force and Las Americas will pay [Bernard] the amounts due thereunder in the event the contingenc[y] described therein [is] realized.

The Loan Agreement was negotiated over the summer of 1986, and finalized and signed on September 16, 1986. The Loan Agreement included a provision that LAC would "pay Acevedo/Flores twelve percent (12%) of any and all funds ... which it receives or $360,000, whichever sum is greater," if LAC "decide[d] to dismiss its application to the FCC in return for a payment or payments from any other applicant or applicants whose applications are or shall be pending and subject to the FCC hearing proceedings." The Loan Agreement also contained a "call" provision that allowed Flores and Acevedo to demand $360,000 after two years if LAC's

---

1. President Bernard is not related to Bernard, and the two had never met prior to this telephone conversation.

application to the FCC was still pending. At trial, LAC claimed that Bernard had failed to advise LAC of the adverse impact that this "call" provision of the Loan Agreement would have upon its FCC application, and that Bernard failed to disclose this provision to the FCC.

Having resolved the NYNB funding crisis, LAC proceeded with its License application. In 1986, President Bernard enlisted the aid of Rafael Diaz, a personal friend, to obtain additional financing to pay off the competing applicants for the License in exchange for their withdrawal of their applications.[2] From 1986 to 1989, Diaz lent LAC approximately $700,000.

By 1987, LAC had five serious competitors for the License. From 1987 to 1989, LAC negotiated with these five competitors. In the spring of 1989, all five applicants signed a series of settlement agreements which requested that the FCC approve LAC's application. One of the competitors subsequently attempted to withdraw from a settlement agreement with LAC, and LAC brought suit to enforce the contract in the District of Columbia Superior Court. This litigation was settled in November 1989.

Diaz introduced LAC to Midlantic Bank of New Jersey ("Midlantic"), and Midlantic issued a $3,200,000 loan commitment to LAC on January 30, 1989. The proceeds from this loan were to be used by LAC to fund the settlement agreements it had reached with its competitors. An issue arose at trial about whether Midlantic had been informed about the Loan Agreement when it issued this commitment. According to Bernard, on April 2, 1990, he finally prevailed upon LAC to disclose the Loan Agreement to Midlantic. According to President Bernard, he made this disclosure "[w]hen [LAC] first started to deal with Midlantic."

In January 1990, President Bernard and his attorneys, Leroy Wilson and Bernard, met with Flores, Acevedo, and their attorney, Dasil E. Velez. At this meeting, a dispute arose between the parties as to the extent of

LAC's obligations to Flores and Acevedo. The meeting broke up acrimoniously, and Flores and Acevedo commenced a lawsuit against LAC in the Supreme Court of New York, New York County in April 1990, a month after the FCC approved the LAC settlement agreements. This lawsuit sought to compel LAC to arbitrate the value of Flores' and Acevedo's claim under the Loan Agreement. Shortly after this lawsuit began, Midlantic demanded that it be resolved by May 25, 1990, indicating that Midlantic would otherwise withdraw its $3,200,000 financing commitment. This lawsuit also notified several of LAC's competitors of the existence of the Loan Agreement, and three of them filed petitions with the FCC requesting reconsideration of the FCC's prior approval of the settlement agreements.

LAC failed to resolve the Flores/Acevedo lawsuit by May 25, 1990; as a consequence, Midlantic withdrew its $3,200,000 loan commitment on June 5, 1990. In July 1990, the New York Supreme Court granted summary judgment in favor of Flores and Acevedo, and ordered LAC to submit to arbitration on the amount to be paid to them under the Loan Agreement.

On March 13, 1991, the FCC issued an order remanding the LAC application for further hearings before an administrative law judge to determine LAC's qualifications for the License. LAC replaced Bernard and James Gammon, another attorney working on the FCC application, with a Washington law firm in April 1991.

On July 31, 1991, while additional hearings were being held by an FCC administrative law judge, LAC withdrew its application for the License in favor of a competitor in exchange for a payment of $2,100,000 plus interest. LAC received this money in the summer of 1993. Shortly thereafter, Bernard demanded payment under the applicable contingency portion of his retainer agreement (the "Contingent Payment"). After LAC refused his demand, Bernard initiated the present action on September 27, 1993.

---

2. At that time, FCC rules permitted such payoff transactions. Effective August 1, 1991, a new rule was promulgated whereby no payoff amount could be paid to a competing applicant greater than the amount the competitor had actually spent in pursuit of its own application. *See* 47 C.F.R. § 73.3525(a)(3).

On December 1, 1993, LAC answered Bernard's complaint by denying its obligation to pay Bernard and counterclaiming for malpractice, contending that Bernard had "failed to exercise reasonable care and skill" in his representation of LAC. A trial was held in February 1995 at the conclusion of which the jury found that: (1) Bernard's representation of LAC had been negligent; (2) Bernard's negligent representation had not proximately caused LAC's failure to obtain the License; and (3) Bernard had not materially and substantially breached the retainer agreement so as to be disentitled to the Contingent Payment. Accordingly, the district court entered judgment requiring LAC to make the Contingent Payment to Bernard, and dismissed LAC's counterclaim with prejudice.

This appeal followed.

## Discussion

As previously noted, LAC contends on appeal that the district court erred in its instructions concerning proximate causation, damages, and materiality, and in excluding evidence regarding the value of the radio station license that LAC unsuccessfully sought. We consider these contentions in turn.

### A. *Proximate Causation and Damages.*

The interplay between proximate causation and damages resulted in the dismissal of LAC's counterclaim against Bernard despite the jury's verdict that Bernard had been negligent in his representation of LAC. We therefore consider these aspects of the case in tandem.

■ The district court instructed the jury that LAC's counterclaim for malpractice could succeed only if the jury found, in addition to negligent representation by Bernard,

> that [LAC] would have been successful in its ultimate goal to obtain the [License] were it not for the negligent acts of [Bernard].... Therefore, for [LAC] to succeed, you will have to decide ... that, were it not for the negligence of [Bernard], if any, [LAC] would have been the final grantee of the [License].

LAC argues that the district court should have permitted recovery if LAC would have fared better in the application process but for Bernard's negligence, even if that negligence did not proximately cause LAC to lose the License.

■ In an action for legal malpractice under District of Columbia law, which is recognized by both parties as applicable in this diversity of citizenship case, "it is sufficient to show that the movant could have 'fared better' in reaching the ultimate goal sought." *Chase v. Gilbert,* 499 A.2d 1203, 1212 (D.C. 1985) (quoting *Parksville Mobile Modular, Inc. v. Fabricant,* 73 A.D.2d 595, 599, 422 N.Y.S.2d 710, 716 (2d Dep't 1979)). This general rule must be applied, however, with a proper appreciation of the facts of the particular case under adjudication. In *Chase* itself, for example, the claim was that an attorney had negligently represented a client that was seeking a radio station license from the FCC, and the court's focus was upon the outcome of that application. *See id.* ("We hold that, even assuming negligence by Chase, GBC has failed to establish that his negligence caused it to be disqualified for the radio station license.").

In the present case, LAC alleged in its counterclaim that "[h]ad Bernard exercised proper care and skill in [representing LAC], LAC would have been [the] successful applicant for [the License] in the proceeding before the FCC." Moreover, as the district court observed at the charge conference when LAC raised the *Chase* "fared better" formulation, "the evidence and the arguments by counsel" at trial supported the conclusion that LAC was "complaining about ... the loss of a radio license." Furthermore, aside from its mention of the *Chase* "fared better" formulation, LAC approved the verdict sheet that framed the issues for the ensuing jury deliberations.

LAC now contends on appeal that Bernard's negligent representation caused LAC to incur extra expenses with respect to the radio station and the FCC proceeding for which it should be allowed to recover, and that the district court erroneously excluded evidence concerning the economic value of the License. As to the first claim, the case

was not tried on that theory of recovery, and we will not retry the case at the appellate level. As to the second contention, the jury determination that Bernard's negligent representation was not the proximate cause of LAC's failure to obtain the License moots any consideration of evidence regarding the value of the License.

In sum, LAC's arguments concerning the issues of proximate causation and damages do not persuade us to disturb the judgment of the district court insofar as it dismissed with prejudice LAC's counterclaim for legal malpractice.

**B. *Materiality.***

■ In charging the jury as to Bernard's right to the Contingent Payment, the district court said:

> If ... you find that Bernard was negligent in his representation of [LAC], he may not be entitled to compensation. The question is whether [Bernard's] negligence, if any, amounted to such a *material and substantial breach* of the retainer contract as to negate [Bernard's] entitlement to fees.
>
> A material breach of contract is one that would justify the other party in suspending its own performance of the contract. *A substantial breach of contract is one that defeats the purpose of the entire transaction.*
>
> If you find that [Bernard] was negligent, and that his negligence amounted to a *material and substantial* breach of contract, then you may find that [LAC] does not owe [Bernard] the contingency fee. If, however, you find that [Bernard] did not *materially and substantially* breach the retainer contract, [LAC] must pay [Bernard] the agreed-upon contingency fee.

Thus, the district court required the jury to find that Bernard's negligence "defeat[ed] the purpose of the entire transaction" as a prerequisite to excusing LAC's performance.

Bernard was entitled to the Contingent Payment if "Las Americas decide[d] to dis-

miss its application ... in return for a payment from another applicant." It is undisputed that this contingency occurred and LAC did not make the Contingent Payment to Bernard. The question thus posed is whether Bernard's negligent representation (as found by the jury) excused LAC's obligation to make the Contingent Payment.

■ That obligation appears to have been conditioned only upon the occurrence of the stated contingency.[3] Nevertheless, the law considers Bernard's contractual obligation to provide legal representation to LAC to be a condition precedent to LAC's payment obligation. *See* Restatement (Second) of Contracts § 237 (1979) ("[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."). Because Bernard's performance is a constructive condition, he must have substantially performed his obligation to provide legal representation in order to trigger LAC's obligation to make the contingent payment. *See Wakefield v. Northern Telecom, Inc.,* 769 F.2d 109, 113 (2d Cir.1985) ("Under th[e] doctrine [of substantial performance], 'if one party's performance is a constructive condition of the other party's duty, only "substantial" performance is required of the first party before he can recover under the contract.'") (quoting Farnsworth, *Contracts* § 8.12 at 590 (1982)). Of course, the doctrine of substantial performance does not require performance in exact correspondence with the contracted obligation. *See Brown–Marx Assocs., Ltd. v. Emigrant Sav. Bank,* 703 F.2d 1361, 1367 (11th Cir.1983) ("The substantial performance doctrine provides that where a contract is made for an agreed exchange of two performances, one of which is to be rendered first, substantial performance rather than exact, strict or literal performance by the first party of the terms of the contract is adequate to entitle the party to recover on it.").

---

**3.** Indeed, the contract between Bernard and LAC explicitly provided that Bernard would be entitled to the Contingent Payment upon occurrence of the stated contingency even if he had been replaced as LAC's counsel.

A finding that Bernard's conduct in representing LAC materially breached his contract with LAC, however, is equivalent to a finding that Bernard did not substantially perform under the contract. *See* John D. Calamari & Joseph M. Perillo, *Contracts* § 11–18 at 461–62 (3d ed. 1987) ("Substantial performance is the antithesis of material breach. If it [is] determined that a breach is material, it follows that substantial performance has not been rendered."). Therefore, the district court was correct in framing the jury charge in terms of the materiality of any breach by Bernard.

 Under District of Columbia law, an attorney breaches a contract for his legal services if he fails "to perform with reasonable skill," *O'Neil v. Bergan*, 452 A.2d 337, 342 (D.C.1982), and the standard for satisfying the "reasonable skill" requirement in a contract action "is the same as the 'reasonable skill' which an attorney must display to avoid tort liability," *id.* at 343. In the present case, Bernard's legal representation was found by the jury to have been negligent; i.e., in terms of the district court's jury instruction on the issue of negligence, not to have constituted "the exercise of reasonable competence, care and skill."

Thus, the jury's finding that Bernard was negligent established that he breached his contract of employment with LAC. If that breach was material, LAC was excused from performance of its promise to make the Contingent Payment. In our view, the district court erred in instructing the jury that a breach by Bernard would be material only if it "defeat[ed] the purpose of the entire transaction." The standard of materiality under the law of the District of Columbia is considerably less demanding. A breach is material if the promisee "receiv[es] something 'substantially less or different from that for which he bargained.'" *Fowler v. A & A Co.*, 262 A.2d 344, 347 (D.C.1970) (quoting Simpson, *Contracts* § 159 (2d ed.1965)); *cf. O'Neil*, 452 A.2d at 342 (client seeking to establish malpractice by attorney need not base breach of contract claim upon alleged promise to achieve specific result). Because LAC timely objected to the court's instruction and proposed an alternative that accurately reflected the law of the District of Columbia, *see* Fed.R.Civ.P. 51, the judgment in favor of Bernard on his claim for the Contingent Payment must be vacated and the case remanded for a new trial of that claim.

### Conclusion

The judgment of the district court is affirmed insofar as it dismissed LAC's counterclaim with prejudice, and vacated and remanded insofar as it required LAC to make the Contingent Payment to Bernard. The parties shall bear their own costs.