## In re HUDSAR INC., Debtor.

**Mary Ellen PATERSON, Pamela Sutton and Frederick C. Ferguson, Executors of the Estate of Mary Ellen Paterson, Plaintiffs,**

v.

**Everett M. SCHERER, Riker, Danzig, Scherer, Hyland & Perretti, John Doe (a fictitious name), Hudsar, Inc., Thomas W. Paterson, Jr., and Thomas W. Paterson, III, Defendants.**

Bankruptcy No. 86–03475.
Adv. No. 95–2115.

United States Bankruptcy Court,
D. New Jersey.

April 2, 1996.

Colasanti, Ermel & Casale by Michael A. Casale, West Caldwell, New Jersey, for Plaintiffs.

Collier, Jacob & Mills by Cynthia M. Jacob, Somerset, New Jersey, for Defendants Everett M. Scherer and Riker, Danzig, Scherer, Hyland & Perretti.

Riker, Danzig, Scherer, Hyland & Perretti by Louise A. Johnson, Morristown, New Jersey, for Defendant Riker, Danzig, Scherer, Hyland & Perretti.

Dechert, Price & Rhoads by Christopher J. Michie, Princeton, New Jersey, for Defendant Thomas W. Paterson, Jr.

### *OPINION*

ROSEMARY GAMBARDELLA,
Bankruptcy Judge.

Before the court is the motion for summary judgment by Defendants Riker, Danzig, Scherer, Hyland & Perretti and Everett M. Scherer (collectively, "Riker, Danzig") dismissing the claims of the Executors of the Estate of Mary Ellen Paterson, et al., ("the MEP Estate") against Riker, Danzig. Said claims, comprising Counts Ten, Eleven and Twelve of the Second Amended Complaint, consist of allegations of malpractice against Riker, Danzig. The Court conducted a hearing on this motion on August 24, 1995. The following constitutes this Court's findings of fact and conclusions of law.

### FACTS

Hudsar Incorporated ("Hudsar") was a secondary refiner of precious metals, with operations located in Newark, New Jersey. Gordon Paterson, Mary Ellen Paterson's husband, ran the company until his death in 1985. While Gordon Paterson was living, he owned approximately 95% of Hudsar's outstanding shares. Pursuant to Gordon Paterson's Last Will and Testament, his shares were held in his testamentary trust, of which Mary Ellen Paterson ("MEP") was co-trustee with First Fidelity Bank, N.A. and the principal beneficiary of the trust. After Gordon Paterson's death, the Hudsar Board was composed of Mary Ellen Paterson, Thomas W. Paterson and Everett M. Scherer.

In 1986 Hudsar was experiencing financial difficulties and sought an infusion of capital. In March 1986 MEP agreed to loan Hudsar the sum of $300,000 in exchange for a mortgage on the real estate owned by Hudsar and a lien on its machinery, fixtures and equipment.

MEP was to pay off an existing loan held by First National State Bank (later First Fidelity Bank) and was to succeed to the lien held by First National State. MEP's security interest was documented by a mortgage and mortgage note each dated March 14, 1986 and a UCC–1 financing statement was prepared and filed with the Secretary of

State of the State of New Jersey on April 14, 1986.

At the request of both Hudsar and MEP, Everett M. Scherer, Esq. of Riker, Danzig drafted and recorded a mortgage, mortgage note and UCC–1 Financing Statement (the "UCC–1"), evidencing MEP's $300,000 loan to Hudsar and her security interest. At the time of the bankruptcy filing, MEP was Hudsar's only secured creditor.

The loan to Hudsar did not resolve its financial problems. On May 21, 1986, Hudsar's Board of Directors unanimously authorized Hudsar to file for bankruptcy protection. On June 3, 1986, Hudsar filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. By Order dated June 5, 1986, Riker, Danzig was approved as bankruptcy counsel for Hudsar.

During the course of its Chapter 11 proceeding, Hudsar attempted to sell its business as a going concern. When it became clear that this was not possible, Hudsar proposed a liquidating plan of reorganization (the "Plan"). The bankruptcy court sent notice to all creditors on November 30, 1988, conducted a hearing on January 17, 1989 and approved the Disclosure Statement as modified by order of the late Bankruptcy Judge Daniel J. Moore, dated June 29, 1989. Judge Moore confirmed the Plan on September 5, 1989.

The Disclosure Statement at page 7 described MEP's debt as secured by "a first and second mortgage ... against 373–375 South Street, Newark, New Jersey," Hudsar's real property. The Disclosure Statement also indicated that MEP's security interest would be satisfied from the proceeds of the sale of Hudsar's real estate, and that in the event her claim was not satisfied by said sale, MEP would be treated as an unsecured creditor for the unpaid portion.

On July 17, 1990, Hudsar conducted an auction sale of its personal property including machinery, equipment, and other assets in accordance with the provisions of the Disclosure Statement and the confirmed Plan.

The property, which had been valued by Hudsar in its petition and schedules at $492,-000, sold for $41,985.00. After expenses were deducted, the net proceeds were $28,-968.80. None of the net proceeds were turned over to MEP. The funds were used to pay Hudsar's post-petition administration claims.

Also pursuant to its confirmed liquidating plan, Hudsar solicited offers and obtained a bona fide offer to purchase its real estate for $250,000. Subsequently, on October 5, 1990, Hudsar filed a motion for Leave to Sell Property Free and Clear of Liens, Secured Claims and Encumbrances. MEP objected to the proposed sale and no such sale was ever consummated.

On October 30, 1990, approximately four and one-half years after its inception, Hudsar's Chapter 11 case was converted to one under Chapter 7. On November 7, 1990, Bruce H. Levitt, Esq. was appointed as Chapter 7 trustee. On June 4, 1992, Mary Ellen Paterson died. By Order dated January 20, 1995, the Trustee was permitted to abandon Hudsar's real estate.

There have been several actions initiated by MEP or the MEP Estate before this Court. On February 3, 1992, MEP[1] filed an adversary proceeding in this Court against Hudsar and Thomas W. Paterson, Jr. (Adv. Proc. 92–2077). In that proceeding, MEP sought an Order establishing the validity of her lien on Hudsar's machinery and equipment and awarding her damages for Hudsar's alleged conversion of the proceeds of the sale of that machinery and equipment.

On March 14, 1995, this Court granted Thomas Paterson, Jr.'s motion for partial summary judgment on that adversary complaint, Adv.Proc. 92–2077, holding that there was no conversion of the proceeds because MEP's lien on Hudsar's machinery and equipment was not perfected. This Court held that the UCC–1 financing statement failed to contain a "reasonable description of the non-fixture equipment and machinery," and thus was insufficient to perfect MEP's

---

1. After Mary Ellen Paterson's death on June 4, 1992, the Complaint was amended, substituting her estate as the plaintiff.

lien. (O'Grady Cert. Exh. P, Tr. 15–17). The Order granting summary judgment in favor of Thomas Paterson, Jr. and against the MEP estate was entered on March 17, 1995. By order dated April 28, 1995 the pending counterclaim of the Debtor was dismissed and Adversary Proceeding No. 92–2077 was closed.

On September 8, 1992, the MEP Estate filed an application in this Court to disqualify Riker, Danzig as counsel for Hudsar and seeking disgorgement of all fees paid by Hudsar to Riker, Danzig during the bankruptcy case. The MEP Estate asserted that Riker, Danzig was not disinterested under the Bankruptcy Code because, *inter alia,* Riker, Danzig allegedly represented MEP as a secured creditor of Hudsar and thus had an undisclosed conflict of interest. On August 21, 1992, Riker, Danzig voluntarily withdrew from its representation of Hudsar.

On January 6, 1993, a plenary hearing was held on the MEP Estate's disgorgement application and on May 27, 1993 this Court issued an oral opinion denying the MEP Estate's application. This Court stated:

> The Court's review of the entire record also fails to establish that Riker, Danzig represented Mary Ellen Paterson in her capacity as a secured creditor of Hudsar.

(Riker, Danzig Exh. V, Tr. 34.)

The instant action was commenced on June 3, 1992, by MEP's filing of a complaint in the Superior Court of New Jersey, Law Division, Essex County against Riker, Danzig and First Fidelity Bank. On August 20, 1992 the MEP Estate filed an Amended Complaint in the state court against Riker, Danzig and First Fidelity. The Amended Complaint asserted five counts against Riker, Danzig, alleging, *inter alia,* that Riker, Danzig committed malpractice in its representation of MEP in connection with her March 1986 loan to Hudsar. The Amended Complaint further alleged that First Fidelity Bank, as a co-trustee of a testamentary trust of the Estate of Gordon W. Paterson should not have allowed MEP to lend money to Hudsar.

On December 14, 1993, the state court granted Riker, Danzig's motion for summary judgment on Counts One through Five of the Complaint with prejudice as barred by the applicable statute of limitations. By order dated January 21, 1994, the state court granted the MEP Estate leave to file a Second Amended Complaint alleging claims not previously asserted. By that order, the state court reaffirmed its dismissal order except insofar as that order barred on statute of limitations grounds any claim of negligent drafting of the UCC–1, and granted MEP's request to file a second Amended Complaint.

The MEP Estate's Second Amended Complaint, Adv.Proc. 95–2115, asserts, of the thirteen counts, some nine counts against Hudsar, its former officers, Thomas W. Paterson, Jr. and Thomas W. Paterson III, alleging under various legal theories that they caused environmental harm to the property mortgaged to MEP and devalued her security. In the Tenth Count, Riker, Danzig is alleged to have allowed Hudsar and its former officers to cause environmental damage to its property either by negligently advising Hudsar that its conduct was lawful or by failing to advise Hudsar that its conduct was unlawful. In the Eleventh Count, the Complaint asserts that Hudsar and the Patersons, on Riker, Danzig's negligent advice, converted the proceeds of the sale of Hudsar's machinery and equipment in violation of MEP's security interest or, alternatively, that Riker, Danzig negligently drafted the security agreement and UCC–1 financing statement. In the Twelfth Count of the Complaint, it is asserted that Riker, Danzig either represented MEP as a secured creditor of Hudsar or led her to believe the firm represented her in that capacity and was negligent in that representation.

On February 18, 1994, Riker, Danzig filed a timely petition to remove the Second Amended Complaint to the United States District Court for the District of New Jersey. By Order of the Honorable John W. Bissell, U.S.D.J., dated January 19, 1995, this action was referred and transferred to the Bankruptcy Court.

A hearing was held on the instant motion on August 24, 1995 at which time this Court reserved decision. This Opinion follows and constitutes this Court's findings of fact and conclusions of law.

## DISCUSSION

### I. Summary Judgment Standard

 Summary Judgment is appropriate only when there is no genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party moving for summary judgment has the burden of establishing the nonexistence of any "genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Fairbanks, Morse & Co. v. Consolidated Fisheries Co.*, 190 F.2d 817, 824 (3d Cir.1951). Where the non-moving party bears the ultimate burden of persuasion on a dispositive issue at trial, the non-moving party must "go beyond the pleadings" and, by way of affidavits, depositions, answers to interrogatories, or admissions on file "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The evidence which the non-moving party produces to show the existence of a genuine issue must be of sufficient quantum and quality to allow a rational and fair-minded fact finder to return a verdict in favor of the non-movant, bearing in mind the applicable standard of proof that would apply at a trial on the merits. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).[2]

 The Court must resolve all factual disputes, all doubts as to the existence of genuine issues of material fact, and any inferences that may be drawn from underlying facts against the moving party. *See Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1244 (3d Cir.1980); *In re Windsor Communications Group, Inc.*, 68 B.R. 1007, 1010 (E.D.Pa.1986). The purpose of summary judgment is to avoid a trial which is unnecessary and results in delay and expense, by promptly disposing of any actions in which there is no genuine issue of

material fact. *Tomalewski v. State Farm Life Ins. Co.*, 494 F.2d 882, 884 (3d Cir.1974). Summary judgment is a "drastic remedy" which is not to be granted liberally. *Id.* (cited with approval in *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981)).

### II. Standing/Duty

Riker, Danzig contends that the three claims against it fail for the most straightforward of reasons: Mary Ellen Paterson was not a client of Riker, Danzig in her capacity as a secured creditor of Hudsar and hence, as a matter of law, Riker, Danzig owed no duty to Mrs. Paterson in that capacity. Thus, Riker, Danzig asserts the Estate of MEP has no standing to assert a malpractice claim arising out of Riker, Danzig's attorney client relationship with Hudsar.

The MEP estate, on the other hand, argues that the facts of this case created a duty to Mrs. Paterson despite her status as a non-client.

 The MEP Estate claims that Riker, Danzig negligently advised Hudsar, negligently drafted the UCC–1, was negligent in the advice given to MEP, in their representation of MEP throughout the bankruptcy proceedings, in their failure to advise MEP to obtain independent counsel causing damages to MEP; so to constitute claims for legal malpractice. The requisite elements of a cause of action for legal malpractice are: (1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) the breach of that duty; and (3) proximate causation. *Albright v. Burns*, 206 N.J.Super. 625, 632, 503 A.2d 386 (App.Div. 1986); *Lovett v. Estate of Lovett* 250 N.J.Super. 79, 87, 593 A.2d 382 (Ch.Div.1991).

This court has already determined that Riker, Danzig did not represent MEP in her capacity as a secured creditor of Hudsar. This Court stated in the MEP Estate's disgorgement action:

---

2. The Court of Appeals for the Third Circuit has held that the non-movant may defend a motion for summary judgment upon a lesser standard of proof, stating "[i]f ... there is any evidence in the record from *any* source from which a reasonable inference in the [non-moving party's] favor may be drawn, the moving party simply cannot

obtain a summary judgment...." *In re Japanese Elec. Prods. Antitrust Litigation*, 807 F.2d 44 (3d Cir.1985), *cert. denied sub nom. Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987) (emphasis added).

The Court's review of the entire record also fails to establish that Riker, Danzig represented Mary Ellen Paterson in her capacity as a secured creditor of Hudsar. (Riker, Danzig Exh. V, Tr. 34.) Riker, Danzig has also cited case law which it contends stand for the proposition that an attorney is not liable to a non-client for negligence in the performance of his or her professional duties.

In *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss,* 991 F.2d 1501 (9th Cir.1993), the district court's grant of summary judgment was affirmed in favor of a corporation's counsel where that court, applying New York law, found that no attorney client relationship existed between the plaintiff, who was an officer of the corporate client, and the law firm. Also, in *United Bank of Kuwait PLC v. Enventure Energy Enhanced Oil Recovery Assocs,* 755 F.Supp. 1195 (S.D.N.Y.1989), a case decided under New York law, summary judgment was granted in favor of a law firm which had issued an opinion letter on behalf of a client at the request of a non-client, where the non-client brought the malpractice and negligent misrepresentation claims against the law firm. Finally, in *Quintel Corp., N.V. v. Citibank,* 589 F.Supp. 1235 (S.D.N.Y.1984), the court, applying New York law, granted a motion to dismiss a breach of fiduciary claim against a law firm where the law firm did not represent the complaining parties.

The MEP Estate argues that the above cited cases are inapposite because they set forth New York's more restrictive malpractice law, not the law of New Jersey.

■ There is no dispute that the instant case is governed by New Jersey law. "New York law, with few exceptions requires privity before a lawyer can be held liable by a party not his client in the absence of fraud, collusion or a malicious or tortious act." *Waggoner,* 991 F.2d at 1508, citing *Stratton Group v. Sprayregen,* 466 F.Supp. 1180, 1184 n. 3 (S.D.N.Y.1979). However, the Appellate Division of the New Jersey Superior Court has repeatedly recognized that, under New Jersey law, attorneys owe a limited duty in favor of specific non-clients. In *Stewart v. Sbarro,* 142 N.J.Super. 581, 362 A.2d 581 (App.Div.), *certif. denied,* 72 N.J. 459, 371 A.2d 63 (1976), an attorney for the buyers of a corporation agreed to obtain the buyers signatures on a bond and mortgage indemnifying the sellers against liability for existing corporate debt. The attorney failed to obtain the required signatures. As a result, the debt was unsecured, rather than secured. When the buyers filed bankruptcy, the sellers sued their own attorney, the buyers, and the buyers' attorney. The *Stewart* court held that the buyers' attorney could be liable in negligence for breaching a duty to the sellers, reasoning that when an attorney should foresee that a third party may rely on the attorney's promise to act, a duty attaches. The *Stewart* court stated:

> It is true that generally an attorney is not liable to third persons for negligence in the performance of his professional duties. See Annotation, "Attorney's liability, to one other than his immediate client, for consequences of negligence in carrying out legal duties," 45 A.L.R.3d 1181 (1972). But this rule is not all encompassing. Thus, where an attorney assumes a fiduciary obligation, it applies to persons who, though not strictly clients, he has or should have reason to believe rely on him. *In re Genser,* 15 N.J. 600, 606, 105 A.2d 829 (1954); *Drinker, Legal Ethics* (1953), at 92. We believe, moreover, that where, as here, an attorney undertakes a duty to one other than his client, he may be liable for damage caused by a breach of that duty to a person intended to be benefited by his performance. Cf. *Donald v. Garry,* 19 Cal.App.3d 769, 97 Cal.Rptr. 191, 192 (D.Ct.App.1971).

*Id.* at 593, 362 A.2d 581.

Also, in the case of *Albright v. Burns,* 206 N.J.Super. at 633, 503 A.2d 386 the Appellate Division held that an attorney was liable to a decedent's estate when the attorney knowingly facilitated improper transactions involving the holder of the decedent's power of attorney. The court stated "a member of the bar owes a fiduciary duty to persons, though not strictly clients, who he knows or should know rely on him in his professional capacity. We think it follows that privity should not be required between the attorney and one harmed by his breach of duty where the

attorney had reason to foresee the specific harm which occurred." *Id.* at 632–33, 503 A.2d 386 (citations omitted).

More recently, in the case of *R.J. Longo Constr. Co. v. Schragger*, 218 N.J.Super. 206, 208–09, 527 A.2d 480 (App.Div.1987), the court considered a case involving township attorneys who had prepared contract documents used for the bidding process for construction of a sewer facility. After the plaintiff's bid was accepted, the attorneys for the Township drafted the contract. The plaintiff began the construction work after the Township notified it to proceed. The Township failed to obtain the necessary easement right of way for the sewer system. Consequently the successful bidder, R.J. Longo Construction Co. ("Longo"), which had begun construction, was forced to stop work. As a result Longo suffered losses and sued the Township attorneys alleging among other things, that the Township attorneys negligently permitted plaintiff to begin construction work without easements necessary for completion, contrary to the explicit language of the contract. The trial court dismissed the claims against the township attorneys for failure to state a cause of action because of the absence of privity. The Appellate Division reversed, holding that the attorneys owed the contractor a fiduciary duty and that they were liable for the foreseeable consequences of their negligent misrepresentations on which the plaintiff reasonably and foreseeably relied. *Id.* at 209–10, 527 A.2d 480. The court also held that Longo was an intended third party beneficiary of the attorneys' employment contract with the township. The *R.J. Longo Constr. Co.* court noted:

It is quite obvious that plaintiff relied reasonably upon the Township obtaining the easement rights of way. Clearly, the bid submitted by plaintiff reflected that fact. It is also obvious that plaintiff had every right to rely on the notice to proceed as a signal that the easements had been obtained. Submission of the contract to plaintiff's independent attorney in the circumstances would not have affected plaintiff's reliance on defendants because the contract price contemplated that the owner would obtain the easements. We hold

therefore that § 28.1 created a special fiduciary duty upon defendants subjecting them to damages for the reasonably foreseeable consequences for breaching that duty. Furthermore, § 28.1 of the contract made plaintiff, the out-of-privity prime contractor, an intended third party beneficiary of the employment contract between the Township and defendants.

*Id.* at 209–10, 527 A.2d 480.

Riker, Danzig characterizes the above cases as "exceptional circumstances where the attorney made an express misrepresentation to the non-client in the form of an opinion letter or otherwise, or where the attorney expressly assumed an obligation to perform some service for the non-client." (Riker, Danzig's Memorandum in Support of Summary Judgment at 23–24). However, no New Jersey case has announced such formalistic requirements.

In 1995, the Supreme Court of New Jersey addressed the issue of attorney liability to non-client third parties in *Petrillo v. Bachenberg*, 139 N.J. 472, 655 A.2d 1354 (1995). In *Petrillo*, the attorney for the seller of property had prepared and delivered to the seller a composite report of some of the percolation tests performed on the property. The composite report did not reflect the fact that the property had actually failed 28 out of 30 percolation tests. Upon discovering the actual percolation test results, the prospective purchaser of the property refused to complete the purchase and the seller refused to return the down payment. The purchaser brought an action against, among others, the seller's attorney claiming it was foreseeable that she would rely on the composite report in making the decision to purchase the property. The Law Division concluded that the attorney did not owe a duty to the plaintiff to provide a complete and accurate report. The Appellate Division reversed, 263 N.J.Super. 472, 623 A.2d 272 (1993). Affirming the judgment of the Appellate Division, the New Jersey Supreme Court announced:

We also recognize that attorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorneys' represen-

tations and the non-clients are not too remote from the attorneys to be entitled to protection.

*Petrillo,* 139 N.J. at 483–84, 655 A.2d 1354.

■ Turning to the instant case, with the forgoing recitation of New Jersey malpractice law in mind, the issue before the court becomes whether Riker, Danzig knew, or should have known, that MEP was relying on its representations and whether MEP was not too remote to be entitled to protection. To answer that question the court must examine the particularities of this case.

Everett Scherer and MEP evidently had a relationship that spanned many years. Mr. Scherer had represented MEP prior to the filing of Hudsar's bankruptcy. In March 1986, Mr. Scherer prepared and, in April 1986, filed documents to perfect MEP's mortgage and security interest. (Certification of Michael A. Castle, Exh. I). Scherer represented Gordon and Mary Ellen Paterson in real estate transactions over the years, prepared their wills, and when Gordon Paterson died in 1985, represented his Estate and its executors. Riker, Danzig also continued to represent MEP, after the filing of Hudsar's bankruptcy, in a real estate purchase and sale in 1988 and 1989. (Certification of Michael A. Casale, Exhibit O). Moreover, Mr. Scherer not only represented the family business (Hudsar), but was also a director of Hudsar.

In addition, there were communications from Everett Scherer to MEP during the course of Hudsar's bankruptcy concerning the status of her security interest. On March 24, 1987, Mr. Scherer wrote to MEP, addressing her by her nickname, "Timie":

> You of course are a secured creditor on your mortgage and Tom believes that the property and equipment has sufficient value to insure that you would be paid in full on your mortgage loan.

(Certification of Michael A. Casale, Exhibit G). Mr. Scherer reiterated his assurances in a December 14, 1988 letter to Mary Ann Michaels of First Fidelity Bank, a copy of which was sent to MEP. "Mrs. Paterson is a secured creditor with a lien on the building and machinery and hopefully these items can be sold to pay her claim in full." *Id.* at Exhibit H.

Riker, Danzig characterizes the above correspondences as simply responses to the inquiries of a creditor. However, based on the relationship between MEP and Everett Scherer and the tone of the letters (addressing Mrs. Paterson as "Timie"), the Court finds that a genuine issue of material fact exists as to whether Riker, Danzig knew, or should have known that MEP would rely on the representations made to her.

Furthermore this record, which discloses that Everett Scherer had, prior to the Hudsar bankruptcy filing, represented Gordon and Mary Ellen Paterson in the acquisition of several homes and represented MEP in the original loan transaction with Hudsar, *see* O'Grady Cert. at Exh. V., p. 12, 22–23, raises genuine issues of fact as to MEP's remoteness from Riker, Danzig and whether she should be entitled to protection, under the test articulated in *Petrillo v. Bachenberg,* 139 N.J. 472, 655 A.2d 1354 (1995).

Therefore, the Court cannot say that as a matter of law Riker, Danzig owed no duty to Mary Ellen Paterson, and thus, Riker, Danzig's Summary Judgment Motion cannot be granted on the ground of lack of standing.

■ Preliminarily, Riker, Danzig also argues that the MEP Estate is collectively estopped from relitigating the court's prior finding in the disgorgement motion that Riker, Danzig did not represent MEP in her capacity as a secured creditor. Riker, Danzig argues that collateral estoppel bars the relitigation of any factual issue that was actually determined in a prior action between the same parties, even though the action involved different claims. *See Pittman v. La Fontaine,* 756 F.Supp. 834, 841 (D.N.J.1991); *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). Essentially, Riker, Danzig argues that if MEP was not Riker, Danzig's client, her estate has no standing to sue Riker, Danzig for legal malpractice so that the Twelfth Count of the Second Amended Complaint should be dismissed.

The court does not find that its findings on the disgorgement motion precludes MEP's

malpractice claims. The issues before the court on that application were whether the Riker, Danzig firm should be compelled to disgorge fees previously allowed by this court and paid by the Debtor, Hudsar, based on a conflict of interest and lack of disinterestedness as required by 11 U.S.C. § 327. Another issue before the court was whether the original disclosures made to the court by the Riker, Danzig firm were adequate and sufficient to advise the court of any probable conflict of interest. (*See* Cert. of Dennis O'Grady In Support of Motion for Summary Judgment at Exh. V, p. 3–4). The court at that time found that the record failed to establish that Riker, Danzig represented MEP in her capacity as a secured creditor of Hudsar. (O'Grady Cert., Exh. V., p. 34.) The court also found that Everett Scherer was not a disinterested person within the meaning of § 101(14)(d) in his position as director of the Debtor, Hudsar, in June 1986 at the time of the firm's request to be retained as Hudsar's bankruptcy counsel, but that Riker, Danzig's failure to disclose Scherer's directorship was not an intentional nondisclosure mandating the disgorgement of fees. *See* O'Grady Cert., Exh. V, at p. 34–35, 40. The court did not rule at that time on Riker, Danzig's liability to MEP for any alleged acts or omissions. Accordingly, Riker, Danzig's argument that these claims should now be precluded must fail.

Defendants rely on the case of *In re W.J. Services, Inc.,* 139 B.R. 824 (Bankr.S.D.Tex. 1992). In that case, the court held that the bankruptcy court's order for fee payment to an attorney for services rendered to a Chapter 11 debtor in a case later converted to a Chapter 7, was a determination that the services rendered were reasonable and thus support an implicit finding the malpractice had not occurred. *Id.* at 828. The court invoked the doctrine of *res judicata* to dismiss a removed state court malpractice claim brought by the debtor against its former counsel where the bankruptcy court found that the debtor had an adequate opportunity to present their malpractice claims to the bankruptcy court where the contested issue was decided against them. The court found that the essential facts of both actions were based on the quality, reasonableness and ne-cessity of counsel's work, and that the state court action formed part of the same case or controversy with the bankruptcy case attorney's fee litigation so that the bankruptcy court had supplemental jurisdiction to hear the removed state court claim. 139 B.R. at 826. The bankruptcy court expressly found that the debtor was under a duty to bring up facts relevant to the quality, reasonableness and necessity of their former attorneys' work at the hearings on the application for allow-ance of attorneys fees and that the doctrine of *res judicata* should apply against allowing plaintiffs to have their claims adjudicated once again in another court. *Id.* at 827–28.

Here, the doctrine of *res judicata* is inapplicable as this court, in deciding the prior summary judgment motion in Adv.Proc. 92–2077 and in its decision as to the disgorgement motion, made no findings, express or implicit, as to Riker, Danzig's liability to the MEP Estate on malpractice claims.

## III. The Entire Controversy Doctrine

■ Riker, Danzig raised, in a letter brief dated August 23, 1995, and at oral argument on August 24, 1995, New Jersey's entire controversy doctrine as an additional grounds upon which summary judgment should be granted to the defendants.

As noted above, MEP filed an adversary proceeding, Adv. Proc. 92–2077, during Hud-sar's bankruptcy proceeding to determine the extent and validity of her liens on the Debt-or's assets and a related supplemental state law claim of conversion ("the First Action"). Later, the MEP Estate asserted, in support of its Disgorgement Motion, that Riker, Danzig had a disqualifying conflict of interest because it allegedly represented MEP as a secured creditor at the same time as it repre-sented the Debtor in the bankruptcy pro-ceeding. Riker, Danzig was not added as a party defendant to the adversary proceeding to determine the extent and validity of liens nor were the malpractice claims against Rik-er, Danzig raised in the earlier disgorgement action. Instead, the MEP Estate chose to split off its malpractice claims against Riker, Danzig and pursue them in the separate

state court action, since removed to this court.

Riker, Danzig argues that because MEP did not raise her legal malpractice and negligent representation claims within the First Action, the adversary proceeding to determine extent and validity of liens, or the disgorgement action, the entire controversy doctrine mandates the dismissal of the instant claims as against Riker, Danzig.

 New Jersey's entire controversy doctrine is a claim preclusion rule requiring that a litigant assert all related claims against all parties in one action or be precluded from bringing a second action. *Melikian v. Corradetti*, 791 F.2d 274, 279 (3d Cir.1986), *cert. denied*, 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43, *reh'g denied*, 498 U.S. 1017, 111 S.Ct. 594, 112 L.Ed.2d 598 (1990). Accordingly, all claims which arise out of the same common nucleus of operative facts must be resolved in a single action. *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 165 (3d Cir.1991), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992). The entire controversy doctrine is codified in New Jersey Court Rule 4:30A, which provides:

> Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by R. 4:64–5 (foreclosure actions) and R. 4:67–4(a) (leave required for counterclaims of cross-claims in summary actions). . . .

N.J.Court R. 4:30A.

The definition and scope of the doctrine is governed by case law. In *Cogdell v. Hospital Ctr.*, 116 N.J. 7, 560 A.2d 1169 (1989), the plaintiff brought medical malpractice claims against two doctors. The case was tried to conclusion, with the jury returning a verdict in favor of both defendants. The plaintiff then commenced a second action alleging negligence by the hospital, members of the operating team, and several hospital administrators. The defendants moved to dismiss the action asserting that the entire controversy doctrine mandated their joinder as parties in the earlier action and therefore the current lawsuit against them was barred.

 In *Cogdell*, the New Jersey Supreme Court considered the underlying policies of the entire controversy doctrine.

> The entire controversy doctrine embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy.

*Cogdell*, 116 N.J. at 15, 560 A.2d 1169. The *Cogdell* court went on to explain that:

> The purposes of the doctrine include the needs of economy and the avoidance of waste, efficiency and the reduction of delay, fairness to parties, and the need for complete and final disposition through the avoidance of "piecemeal decisions." (Citation omitted.)

*Id.*

On August 1, 1995 the New Jersey Supreme Court decided a series of cases addressing the scope of the entire controversy doctrine. *See DiTrolio v. Antiles*, 142 N.J. 253, 662 A.2d 494 (1995); *Circle Chevrolet v. Giordano, Halleran & Ciesla*, 142 N.J. 280, 662 A.2d 509 (1995); *Mystic Isle Development Corp. v. Perskie & Nehmad*, 142 N.J. 310, 662 A.2d 523 (1995); and *Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co.*, 142 N.J. 336, 662 A.2d 536 (1995). Each case presents a slightly different aspect of the issues that have arisen in the application of the entire controversy doctrine.

In *DiTrolio v. Antiles*, 142 N.J. 253, 662 A.2d 494 (1995), the plaintiff was a physician whose application for full promotional staff privileges had been denied by his employer, a hospital. That decision was upheld by the hospital's medical board and the Hospital's Board of Trustees. Plaintiff thereafter filed suit against the hospital and its board of trustees in the Chancery Division alleging that the medical board's decision was arbitrary and capricious, and deprived defendant of his right to due process. *DiTrolio*, 142 N.J. at 263, 662 A.2d 494.

Discovery began and continued for almost a year. Subsequently, plaintiff and the hospital reached a settlement agreement in which plaintiff agreed to dismiss the then-pending lawsuit without prejudice, and agreed not to institute a new action against the Hospital and its Board of Trustees based on conduct preceding February 8, 1989, the date of the Board's report. *Id.* at 265. The settlement also contained a provision where the plaintiff reserved the right to pursue an action against any other individual or entity.

Six days after the settlement was signed, plaintiff brought suit against several doctors and their professional medical group for injury to his reputation and his economic well being and for emotional distress. The trial court applied the entire controversy doctrine to bar the second action. The Appellate Division reversed. The New Jersey Supreme Court reversed the Appellate Division's determination and held that, pursuant to the entire controversy doctrine, plaintiff was barred from bringing the second suit. *Id.* at 279, 662 A.2d 494.

The *DiTrolio* court, citing *Cogdell,* 116 N.J. at 15, 560 A.2d 1169, identified three purposes furthered by the doctrine: "(1) the need for a complete and final disposition through avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." *DiTrolio,* 142 N.J. at 267, 662 A.2d 494. These purposes were then applied to the plaintiff's second action.

Addressing the policy of avoiding piecemeal decisions, the *DiTrolio* court stated: "[t]he entire controversy doctrine does not require commonality of legal issues. Rather, the determinative consideration is whether distinct claims are aspects of a single larger controversy because they arise from interrelated facts." *Id.* at 271, 662 A.2d 494. The *DiTrolio* court then found that the second action arose from the same core set of related factual circumstances as the first action. ■ The second purpose of the doctrine is judicial fairness, which focuses on basic fairness to all of the parties. *Id.* at 272, 662 A.2d 494. "Fairness in the application of the entire controversy doctrine focuses on the

litigation of the respective parties and whether all of their claims and defenses could most soundly and appropriately litigated and disposed of in a single comprehensive adjudication." *Id.* at 277, 662 A.2d 494.

The *DiTrolio* court found that the defendants were disadvantaged because they were not parties to the first litigation. They might have approached the depositions and discovery in the original action differently, had they been made parties to that action. *Id.* at 273, 662 A.2d 494. With respect to the plaintiff, the court found that "plaintiff had ample opportunity to have fully litigated the claim in the first action; he simply chose not to." *Id.* at 274, 662 A.2d 494. Thus, the *DiTrolio* court determined that bringing the suits in one action would have been the fairest course of action.

The third factor examined by the *DiTrolio* court is:

the policy that mandatory joinder is appropriate to further "[j]udicial economy and efficiency—the avoidance of waste and delay." *Cogdell,* 116 N.J. at 23, 560 A.2d 1169. At its most fundamental level inefficiency is a "duplication of lawsuits ... [and] multiple actions each involving the identical controversy and the same witnesses." *Id.* at 26, 560 A.2d 1169.

*DiTrolio,* 142 N.J. at 277, 662 A.2d 494. The *DiTrolio* court found that "[t]he wrongful conduct of the defendants in frustrating plaintiff's promotion is at the heart of all the tort claims." *Id.* at 278, 662 A.2d 494. Further, the second action would "require the production of substantially the same evidence that would be adduced in the first action." *Id.*

Therefore, because the application of the entire controversy doctrine would further the three purposes behind the doctrine, the *DiTrolio* court barred plaintiff from bringing the second suit.

The case of *Mortgagelinq v. Commonwealth Land Title Ins. Co.,* 142 N.J. 336, 662 A.2d 536 (1995), arose from a massive fraud committed on the plaintiff mortgage lender, Mortgagelinq Corp., and the Federal Home Loan Mortgage Corporation (Freddie Mac),

assignee of some of the loans. Defendants in this case, principally New Jersey title insurance companies, were allegedly accessories to the fraud.

Mortgaglinq Corp. sued several defendants in the U.S. District Court for the Eastern District of Pennsylvania and Freddie Mac successfully intervened as a plaintiff. Subsequently, Mortgagelinq Corp. and Freddie Mac brought suit against a different set of defendants in the New Jersey Superior Court, Law Division, Camden County. Both actions were based on the same mortgage transactions and alleged the same fraud.

The issue in *Mortgagelinq*, most broadly stated, was whether the entire controversy doctrine has an extraterritorial effect. "The specific question in whether New Jersey courts are obliged to entertain claims against parties that could have been joined with substantially similar claims pursued by the same plaintiffs against other parties elsewhere." *Mortgagelinq*, 142 N.J. at 338, 662 A.2d 536. Stated more narrowly: "[t]he issue is whether the non-joinder of parties in a related action in the Pennsylvania federal court results in the same party preclusion in New Jersey." *Id.* at 343, 662 A.2d 536.

The *Mortgagelinq* court reviewed the underlying policies of the entire controversy doctrine as stated in *Cogdell* and *DiTrolio*. One of those policies is fairness:

New Jersey's goals are served by precluding claimants from bringing an action against a party that could have been joined in an earlier action brought elsewhere. The issue is whether it is fair to do so. One aspect of that review is consideration of whether a trial court, confronted in the earlier action with an entire controversy application, "would clearly have found grounds to excuse joinder." *DiTrolio, supra*, 142 N.J. at 274–275, 662 A.2d 494. . . .

We believe that the Pennsylvania federal court would not have severed the New Jersey defendants had there been a timely effort to join them. Further, any later claim that joinder would have been inappropriate is weakened by plaintiffs' failure to give the trial court the opportunity to make such a determination.

*Id.* at 344, 662 A.2d 536.

The *Mortgagelinq* court held that the New Jersey action was subject to dismissal under the entire controversy doctrine. However, in the interests of comity, the court determined the dismissal to be without prejudice.[3]

The other two recent New Jersey Supreme Court entire controversy doctrine cases, *Circle Chevrolet* and *Mystic Isle*, addressed the application of the doctrine to legal malpractice actions.

*Circle Chevrolet v. Giordano, Halleran & Ciesla*, 142 N.J. 280, 662 A.2d 509 (1995), addressed the issue of whether the entire controversy doctrine applies to a malpractice action against an attorney who represents a client in the underlying transaction. Plaintiff, a corporation that operated a car dealership, had entered into a thirty-year lease with the owner of the land upon which the dealership was located. The lease contained a clause providing for periodic rent increases. The rent increases were to be calculated based on a percentage of increases in the Consumer Price Index (CPI).

Plaintiff was represented by counsel at the discussions regarding the first rent increase. The parties agreed on an increase in rent based on a formula, devised by the landlord's accountant, which calculated the actual increase in the CPI.

Unfortunately, the formula was wrong. It calculated the rent increase based on *actual* increases in the CPI. The lease, however, explicitly stated that the increases would be based upon *percentage* increases in the CPI. As a result, the plaintiff overpaid its rent by $37,699.98. *Circle Chevrolet*, 142 N.J. at 286, 662 A.2d 509.

---

**3.** The *Mortgagelinq* court found that a dismissal for failure to comply with the entire controversy doctrine is more similar to a threshold adjudication than to a adjudication on the merits of the claim. Justice O'Hern explained: "That does not mean that a successive New Jersey action may be brought, because, barring any change in circumstances, the threshold bar would remain in place and be as effective as a final adjudication for purposes of any further New Jersey proceedings. However, our threshold is not a barrier elsewhere." *Mortgagelinq*, 142 N.J. at 347, 662 A.2d 536.

Plaintiff first filed a declaratory action against its landlord to reform the agreement regarding the rental increase. During the course of the reformation litigation, the law firm which represented the plaintiff in the rent increase negotiations withdrew as the plaintiff's counsel because of a conflict of interest. The Plaintiff then obtained new counsel.

The reformation litigation was tried and ultimately ended in a settlement that was memorialized in an order of judgment. In the settlement agreement, the court found that there had been an overpayment of rent in the amount of $37,699.98 and provided the plaintiff with a credit in that amount in its lease payments to its landlord. The plaintiff's monthly rental payment was also adjusted to the proper amount.

Subsequently, the plaintiff commenced a malpractice action against the law firm which represented it in the rent increase negotiations. The plaintiff alleged that the law firm had negligently reviewed the rent increase calculations, resulting in the overpayment of rent and the payment of unnecessary legal fees and costs. The trial court granted the defendant's summary judgment motion, finding that the plaintiff's action was barred by the entire controversy doctrine. A divided Appellate Division affirmed.

In its *Circle Chevrolet* opinion, the New Jersey Supreme Court reiterated the objectives behind the entire controversy doctrine: "(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." *Circle Chevrolet,* 142 N.J. at 289–90, 662 A.2d 509 (quoting *DiTrolio,* 142 N.J. at 267, 662 A.2d 494, and citing *Cogdell,* 116 N.J. at 15, 560 A.2d 1169). In applying those policies to the facts of the case, the *Circle Chevrolet* court noted: "Application of the rule, however, is discretionary and clarification of the limits of the doctrine is best left to case-by-case determination." *Id.*

The *Circle Chevrolet* court held that the entire controversy doctrine applies to a client's legal malpractice claim against his or her attorney even when the attorney is currently representing that client in an underlying action. *Id.* at 289, 662 A.2d 509.

With regard to the plaintiff's malpractice claim, the *Circle Chevrolet* court explained:

[T]he entire controversy doctrine does not require that the malpractice claim be actually litigated with the underlying action; it merely requires that a party notify the court of the existence of material parties. (Citation omitted.) ("a party whose constituent claim arises during the pendency of the action risks its loss unless he apprises the court and his adversary of its existence and submits to judicial discretion the determination of whether it should be joined in that action or reserved").

*Id.* at 293, 662 A.2d 509.

Therefore, the court barred the plaintiff's malpractice claim under the entire controversy doctrine finding that the plaintiff failed to notify the court of the existence of the claim when the court was already involved in determining responsibility for the mistaken calculation. *Id.* at 303, 662 A.2d 509.

Finally, in the case of *Mystic Isle Development Corp. v. Perskie & Nehmad,* 142 N.J. 310, 662 A.2d 523 (1995), the court addressed whether the entire controversy doctrine, as it applies to the joinder of parties, is applicable to attorney-malpractice actions.

In *Mystic Isle,* plaintiff, a real estate developer, purchased property from J.K. Development Company (J.K.). The property was to be developed as a residential apartment complex. Plaintiff purchased the right to construct 78 townhomes in the complex. According to plaintiff, the agreement of sale obligated J.K. to obtain 78 sewer permits from the appropriate municipal authority. However, the municipal authority decided that it would only issue 38 permits.

J.K., through its attorneys, Perskie & Nehmad (P & N) brought suit to compel the municipal authority to issue the permits. P & N later timely amended the complaint to name Mystic as an additional plaintiff as Mystic had recently acquired title to a portion of the property. The municipality issued 18 additional permits, bringing the total

to 56. During the hearing, the municipal authority established that there was insufficient capacity to issue the remaining permits. Thus, the decision to withhold the remaining permits was upheld. *Mystic Isle,* 142 N.J. at 317, 662 A.2d 523. Consequently, the plaintiff Mystic represented by other counsel brought suit in Atlantic County, N.J. against several defendants, including: J.K., the principals of J.K., and the municipal authority. Plaintiff alleged, *inter alia,* breach of contract, fraudulent misrepresentation, and wrongful refusal to issue sewer permits. The plaintiff's complaint was eventually dismissed by the trial court.

Seven months later, plaintiff filed a legal malpractice suit against J.K.'s attorneys claiming, *inter alia,* that P & N, without Mystic's authority, amended J.K.'s suit against the municipal authority to include Mystic as a party and failed to obtain its informed consent to P & N representing both Mystic and J.K., knowingly misrepresented to plaintiff the sewer permit situation and breached its fiduciary duty to plaintiff. The trial court denied the defendants' motion for summary judgment, holding that the entire controversy doctrine did not compel dismissal of plaintiff's claim. The Appellate Division denied defendants' motion for leave to appeal the trial court's order. The New Jersey Supreme Court granted defendants' motion for interlocutory review of the Appellate Division's denial of the motion. *Id.* at 322, 662 A.2d 523.

The *Mystic Isle* court began its analysis by reciting the previously mentioned fundamental principles behind the entire controversy doctrine. The court also noted: "because the entire controversy doctrine is an equitable principle, its applicability is left to judicial discretion based on the particular circumstances inherent in a given case." *Id.* at 323, 662 A.2d 523.

The court then explained the boundaries of the doctrine:

[W]e have held that the rule should not be applied when "joinder would result in significant unfairness [to the litigants] or jeopardy to a clear presentation of the issues and just result." *Cogdell, supra,* 116 N.J. at 27, 560 A.2d 1169 (Citation omitted.) However, joinder is not a matter of party autonomy. It is for trial court to determine whether or not joinder is appropriate in a given case, and thus litigants should be compelled to bring all actions at one time. (Citations omitted.).... A plaintiff who fails to allow the trial court the opportunity to supervise the entire controversy risks losing the right to bring that claim later. (Citation omitted).

*Id.* at 324, 662 A.2d 523.

The plaintiff in *Mystic Isle* had urged the court to make an exception to the entire controversy doctrine for claims involving an attorney's malpractice. Including legal malpractice claims in the same controversy with other claims, the Plaintiff argued, is against public policy because it will chill attorney-client relations. It was argued that clients will hesitate to reveal confidences that might later be revealed during litigation if the client attempts to sue the attorney for malpractice. *Id.*

The *Mystic Isle* court did not agree. The court recognized that malpractice claims required special and through consideration. However, the court did not believe that those considerations required the exclusion of all malpractice claims from the mandates of the entire controversy doctrine. *Id.* at 325, 662 A.2d 523.

Instead, the court found that the three policies of the doctrine were furthered by applying it to plaintiff's malpractice claim. First, requiring plaintiff to have joined its malpractice action "would have resulted in a more comprehensive determination of the underlying legal controversy...." *Id.* at 327, 662 A.2d 523.

The second policy behind the doctrine is fairness. The *Mystic Isle* court noted that defendants to the malpractice action, P & N, were disadvantaged by plaintiff's failure to join them in the Atlantic County action. The defendants lost the opportunity to participate in the discovery in that prior action and a key witness could not be located. Therefore, the court found that "party fairness concerns justify the joinder of defendants." *Id.* Thirdly, the court acknowl-

edged that "joinder promotes judicial economy and efficiency." *Id.* at 329, 662 A.2d 523.

Therefore, the *Mystic Isle* court held the plaintiff's malpractice claim to be barred by the entire controversy doctrine and ordered that summary judgment be entered in favor of the defendants dismissing the action against them.

The entire controversy doctrine is an equitable principle and "its applicability is best left to judicial discretion based on particular circumstances inherent in a given case." *Mystic Isle,* 142 N.J. at 323, 662 A.2d 523. Application of the entire controversy doctrine "is discretionary and clarification of the limits of the doctrine is best left to case-by-case determination." *Circle Chevrolet,* 142 N.J. at 290, 662 A.2d 509. (citing *Cogdell,* 116 N.J. at 27–28, 560 A.2d 1169, and *DiTrolio,* 142 N.J. at 275, 662 A.2d 494). Thus, turning to the instant case, this Court must analyze whether applying the entire controversy doctrine to bar the MEP Estate's malpractice claims against Riker, Danzig will further the policies underlying the doctrine, as announced by the New Jersey Supreme Court in the aforementioned cases.

"The entire controversy doctrine balances the objectives of efficiency and fairness." *Circle Chevrolet,* 142 N.J. at 294, 662 A.2d 509. In the case *sub judice,* the convenience of trying the Estate of MEP's malpractice claims with its other claims must be balanced against whether it would have been fair, under all the circumstances, to do so.

The first policy furthered by the doctrine is the avoidance of piecemeal litigation. Requiring MEP to have brought the malpractice claim in the extent and validity of lien adversary proceeding if not the disgorgement motion previously before this court arguably would have resulted in a more comprehensive determination of the underlying legal controversy, avoiding the need for the now removed state court malpractice action. This Court finds that the two adversary proceedings are factually and transactionally related, in that they both relate to Riker, Danzig's conduct with respect to the drafting of the UCC–1 and the sale of Hudsar's property. This finding is further supported by the fact that the parties to both proceedings, as well as the testimony and evidence to be admitted, would be sufficiently identical to require the joinder of both these claims in a single proceeding. As the New Jersey Supreme Court noted in *DiTrolio,* commonality of issues is not required before the entire controversy doctrine precludes the second suit; so long as both proceedings involve aspects of a single larger controversy, the entire controversy doctrine bars separate litigation. 142 N.J. at 271, 662 A.2d 494. Furthermore, it is evident to this Court that MEP was aware of the existence of the facts giving rise to the claims set forth in the present adversary proceeding during the pendency of MEP's adversary proceeding to determine the extent and validity of her lien. Riker, Danzig argues that MEP knew or should have known that she was unlikely to recover her entire claim arising out of her loan to Hudsar from the sale of Hudsar's property as early as the filing of Hudsar's Disclosure Statement and Plan of Reorganization in 1988. It is undisputed that MEP had actual notice of the Disclosure Statement and Plan of Reorganization. The acts alleged against Riker, Danzig in the present Complaint appear to all predate the August 21, 1992 order allowing Riker, Danzig to voluntarily withdraw as counsel to Hudsar. This Court did not grant summary judgment against the MEP Estate in the Adversary Proceeding to determine the extent and validity of lien, Adv. Proc. 92–2077 until March 17, 1995. At no time did the MEP Estate seek to amend that Adversary Complaint to add Riker, Danzig as a defendant or otherwise.

In any event, this Court is satisfied that MEP could have brought the instant malpractice claims against Riker, Danzig as part of the extent and validity of lien adversary proceeding. MEP never added Riker, Danzig as a party defendant to that adversary proceeding, despite having raised Riker, Danzig's alleged conflict of interest by way of the disgorgement motion in the bankruptcy case. Both the conflict of interest claims which arose in the disgorgement proceedings and the instant malpractice claims implicate the existence and quality of Riker, Danzig's

representation of MEP. To permit the Estate of MEP to carve out its malpractice claims from the conflict of interest claims and the prior adversary proceeding to determine the extent and validity of MEP's lien would be to sanction the use of piecemeal litigation. It is precisely this conduct which is discouraged and barred by the entire controversy doctrine.

The third policy furthered by the doctrine, judicial economy, is linked to the first policy of avoidance of piecemeal litigation, and therefore will be discussed before discussing fairness to the parties. Judicial economy would arguably be served by barring MEP's malpractice claims. Clearly, one action where the court could have decided the nature of MEP's lien and any responsibility for negligent draftsmanship of the security interest involved would have been the most efficient approach to the litigation. Furthermore, judicial economy would be furthered because the parties to both proceedings, as well as the testimony and evidence to be admitted, would substantially overlap. Separate litigation clearly has resulted in delayed adjudication of MEP's claims against Riker, Danzig.

 The MEP Estate asserts that resolution of the issue of the legal sufficiency of MEP's lien would have been much more complex and protracted had Riker, Danzig been named as defendants in that adversary proceeding. This Court finds, however, that the plaintiff should have raised its malpractice claims during the pendency of the extent and validity of lien proceeding and that the MEP Estate's failure to do so bars its being raised in this proceeding. The *Circle Chevrolet* court explained:

> [The entire controversy doctrine] merely requires that a party notify the court of the existence of material parties. (Citation omitted.) ("a party whose constituent claim arises during the pendency of the action risks its loss unless he apprises the court and his adversary of its existence and submits to judicial discretion the determination of whether it should be joined in that action or reserved").

*Id.* at 293, 662 A.2d 509. Plaintiffs who fail to raise all claims in a single proceeding and

usurp the Court's determination whether joinder is appropriate risk losing the right to bring that claim later. *Mystic Isle*, 142 N.J. at 324, 662 A.2d 523. The plaintiff herein, as in *Circle Chevrolet*, failed to notify this Court of the existence of its malpractice claims as part of its earlier litigation and is therefore barred from asserting such claims in the present litigation.

 Finally, the convenience achieved by having one action must be weighed against the remaining policy furthered by the doctrine, fairness. Fairness to all parties is of paramount importance.

> Fairness, in the context of party joinder, focuses on basic fairness to all of the parties, especially those sued in the second suit who were previously prevented from participating in the first ... Fairness is thus a protective concept that focuses primarily on whether the defendant would be in a better position to defend themselves if the claims against them had been raised and asserted in the first litigation.

*DiTrolio v. Antiles*, 142 N.J. at 272–73, 662 A.2d 494.

With regard to the defendants in the instant case, Riker, Danzig, fairness is "a protective concept that focuses primarily on whether defendants would be in a better position to defend themselves if the claims against them had been raised and asserted in the first litigation." *Id.* at 273, 662 A.2d 494.

It is quite possible that Riker, Danzig would have approached the discovery process of the First Action differently had they been made a party. *See id.* The MEP estate asserts that Riker, Danzig "would have been put into an impossible conflict by having to defend the sufficiency of their loan documents or risk liability to the secured creditor, and at the same time attack them or risk liability to the debtor." (Plaintiff's Letter Brief of September 29, 1995 at 7.) The *Mystic Isle* court recognized that malpractice claims required special consideration but did not require the exclusion of all malpractice claims from the mandates of the entire controversy doctrine. 142 N.J. at 325, 662 A.2d 523.

Fairness to MEP or the estate of MEP must also be considered. In order to bar the malpractice claim, MEP must have had a fair and reasonable opportunity to have fully litigated that claim in the First Action. *See DiTrolio,* 142 N.J. at 273, 662 A.2d 494.

The MEP Estate argues that the first adversary proceeding was pursuant to the limited jurisdiction of the bankruptcy court under 28 U.S.C. § 157(b)(2)(K) to determine the validity, extent or priority of liens. It is argued that the malpractice claim was not within the limited subject matter jurisdiction of the bankruptcy court, and that therefore, the first proceeding did not afford MEP a fair opportunity to litigate her malpractice claim.

The MEP Estate contrasts the instant case with the cases of *In re Lewison Bros.,* 162 B.R. 974 (Bankr.D.N.J.1993) and *In re Crispino,* 160 B.R. 749 (Bankr.D.N.J.1993), in both of which the courts applied the entire controversy doctrine to bankruptcy proceedings where the first proceeding was a state court suit emanating from a court of general jurisdiction.

Riker, Danzig disagrees· with the MEP Estate's view of this court's jurisdiction and asserts that the bankruptcy court had subject matter jurisdiction over the legal malpractice claim and the other claims asserted therein. In support of that assertion, Riker, Danzig has attached to its Letter Brief of October 9, 1995 a copy of District Court Judge John W. Bissell's opinion referring the instant adversary action to this Court. (*Paterson v. Scherer,* Civil Action No. 94–793, slip op. (D.N.J. Jan. 19, 1995).) Speaking to the MEP Estate's claims now before this Court, Judge Bissell held that:

> [The] present claims at least arise out of the pending case in bankruptcy. They at least 'relate to a case under Title 11' and therefore 'shall be referred to the bankruptcy judges.' 28 U.S.C. § 157(a).... It cannot be said that the claims in [the MEP Estate's] Second Amended Complaint do not at least relate to that Title 11 case.

*Id.* at 6.

Based on Judge Bissell's ruling, this Court finds that MEP's malpractice claims were judicially cognizable in the prior adversary proceeding. Thus, MEP could have litigated the instant claims in the First Action to establish the extent and validity of MEP's lien.

 As a derivative of the fairness determination, the court must also consider whether "the need for a single comprehensive adjudication may be outweighed by the complexity, confusion or unmanageability that might arise from joinder." *DiTrolio,* 142 N.J. at 274–75, 662 A.2d 494. Thus, "[a] reviewing court could determine in hindsight that a trial court, confronted in the earlier action with an entire controversy application would have found grounds to excuse joinder." *Id.* at 274, 662 A.2d 494.

 It is important to remember, however, that it is the trial court's responsibility to determine whether or not the entire controversy should be heard in one proceeding. *See Circle Chevrolet,* 142 N.J. at 293, 662 A.2d 509; *Mystic Isle,* 142 N.J. at 324, 662 A.2d 523; *see also Petrocelli v. Daniel Woodhead Co.,* 993 F.2d 27, 31 (3d Cir.1993) ("[A]ll claims and parties must initially be joined together before one court. The court can determine for itself how best to proceed with the various claims and parties. In order to exercise this discretion, however, the court must be fully informed of the extent of the controversy before it ..."). A plaintiff's failure to allow the trial court the opportunity to make that determination diminishes the force of any claim that joinder would have been inappropriate. *DiTrolio,* 142 N.J. at 275, 662 A.2d 494.

This Court is in a unique position to determine what the trial court would have done had the issue been raised in that earlier proceeding. This Court was the trial court for that adversary proceeding and to the extent applicable the disgorgement motion.

If presented with the malpractice claims in the context of the First Action, any complexity created by addressing the malpractice claims within an adversary proceeding to determine the extent and validity of a lien would not have outweighed the benefit in judicial economy. The plaintiff's argument that it would have been inappropriate to hear the malpractice issue in the First Lien Action, or for that matter, in the context of the

disgorgement motion, are of diminished force because the MEP Estate failed to afford this Court an opportunity to make such a determination.

Based upon this analysis this Court, in the exercise of its discretion, finds that the principles of avoiding piecemeal litigation, promoting judicial economy and fairness to all the parties bar the MEP Estate's legal malpractice claims set forth in Counts 10, 11 and 12 of the Second Amended Complaint.

Finally, the Court notes that Riker, Danzig made several other arguments in support of their motion for summary judgment on each of Counts 10, 11 and 12 of the Complaint. Because this Court finds that the plaintiff is barred by the entire controversy doctrine from bringing its malpractice claims against Riker, Danzig, the Court need not address those arguments.

## CONCLUSION

Accordingly, summary judgment will be entered against the MEP Estate and in favor of Riker, Danzig and Everett M. Scherer on Counts 10, 11 and 12 of the Second Amended Complaint. An Order in accordance with this Opinion shall be submitted.